IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 13-CV-61139-SCOLA/SELTZER

MANUEL ZELAYA, individually and on
behalf of all others similarly situated,

      Plaintiff(s),

v.

NEWPORT MARKETING, LLC, a Florida
limited liability company, NEWPORT
HOSPITALITY, LLC, a Florida limited
liability company, and NEWPORT
VACATIONS MANAGER, LLC, a Florida
limited liability company,

      Defendants.

_____/

## DECLARATION OF STEVEN HUROWITZ IN SUPPORT OF MOTION TO DISMISS, OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGEMENT

Declarant is Steven Hurowitz, who makes this Declaration as the President of Defendant Newport Marketing, LLC ("Newport Marketing"), and who states:

1. I am over eighteen years of age and make this Declaration based upon my personal knowledge. I have been President of Newport Marketing since its inception. I have reviewed the Class Action Complaint ("Complaint") in the instant action.

2. Newport Marketing provides marketing services for certain interval ownership condominium units (i.e, "time-share" condominium units) for Newport Beachside Hotel & Resort.

3. At the times relevant to the Complaint, Newport Marketing did not place telemarketing calls, or any calls, to Plaintiff or anyone else promoting resorts or time-share offers.

4.   The telephone numbers identified in the Complaint—(302) 394-6888, (954) 334-3110, and (305) 260-6112—do not belong to Newport Marketing or any other named Defendant.

5.   Newport Marketing hired third-party independent contractors to generate qualified tours for sales programs promoting the "time-share" units.  These third-party marketers were engaged to procure qualified prospects ("leads") using reasonable and suitable marketing methods, strictly subject to applicable law.  Attached as Exhibits 1 through 4 are true and correct copies of contracts with these third-party marketers.  Newport Marketing's contracts with these third-party marketers (attached) required the marketers to comply with all applicable State and Federal Do Not Call Statutes/Requirements and all other applicable local, state and federal laws pertaining to telemarketing, solicitation, consumer protection, etc.

6.   Newport Marketing did not direct, control, advise, lead or oversee any of these third-party marketer's actions or efforts in generating leads.  Newport was not involved in any call activities of these third parties.  Newport never had access to any call records, or any information regarding the calls made or telephones used to make the calls.


PURSUANT TO 28 U.S.C. § 1746(2), I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS IN THIS DECLARATION ARE TRUE AND CORRECT.

Executed on this 3rd day of September, 2013.


Steven Hurowitz

# EXHIBIT 1

**EXHIBIT 1**

## MARKETING SERVICES AGREEMENT

### (TOUR GENERATION)

This MARKETING SERVICES AGREEMENT ("Agreement") is made by and between ~~VACATION CONCEPTS~~ *INC. (VGI)* "Marketer") and Newport Marketing, LLC ("NM").

### RECITALS

WHEREAS, NM is the Master Marketer of certain interval ownership condominium unit weeks for Newport Beachside Hotel & Resort,

WHEREAS, NM desires to enter into an agreement with Marketer whereby Marketer will conduct tour generation programs ("Marketing Services") intended to provide NM with persons meeting certain qualifications ("Qualified Prospects") for sales presentations at specified timeshare project.

WHEREAS, Marketer and NM agree that this agreement will replace any and all previous agreements;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

### AGREEMENT

1.  **NM'S ENGAGEMENT OF MARKETER**

    a.  NM hereby engages and retains Marketer to procure Qualified Prospects for NM, pursuant to the specified qualifying criteria detailed in this Agreement, using such reasonable and suitable marketing methods, strictly subject to the limitations, terms and conditions set forth in this Agreement, and by applicable law.

    b.  If Marketer intends to procure Qualified Prospects for NM via internet website solicitation., Marketer must submit all website pages and links to NM for express approval (in a writing, or email) prior to making any website pages or links available to the general public ("going live").

    c.  Prospects from states where the Project(s) is not registered are not eligible as Qualified Prospects. Disclosure of this restriction must be distinctly included on the applicable web pages(s). Marketer must include NM's approved terms and conditions on all website pages. During the qualification portion of the booking telephone call, Marketer shall determine if the Prospect is qualified for the offer by verifying the state in which the Prospect resides.

    d.  Marketer must comply with all applicable State and Federal Do Not Call Statutes/Requirements.

2.  **PROJECTS**

    a.  Marketer is authorized to provide Marketing Services for sales presentations at NM's sales center as detailed on Exhibit "A", attached hereto and made a part of herewith.

3.  **PAYMENT FOR SERVICES**

    a.  NM agrees to pay Marketer for Services as detailed per project on "Exhibit "A", attached hereto and made a part of herewith.

1

4.   <u>NOTICES</u>

Any notice required or permitted to be given under this Agreement shall be in writing and sent to the following addresses, by registered or certified mail, overnight courier, facsimile, e-mail, or another method which provides a confirmed delivery receipt, except as such addresses may be changed by delivering written notice to the other party from time to time:

a. If to Marketer: ~~Vacation Getaway Inc.~~

Address: ~~P.O. Box 487~~

~~Opa Locka FL 33056~~

E-Mail: ~~Ed Vacationgetawayinc.com~~

Phone Number: ~~305 xxx xxxx~~

Fax: ~~305 xxx xxxx~~

b. If to Newport Marketing, LLC:
16701 Collins Avenue
Sunny Isles Beach, FL 33160

Attn: _Daily n Mizrahi_

E-Mail: _DMizrahi@NEWPORTvacationclub.com_

Phone Number: _305 949 1800_

Fax: _305 947-5873_

//
//
//

[GENERAL TERMS TO FOLLOW]

2

## GENERAL TERMS

5.   **QUALIFIED PROSPECT**

   a.   A prospect shall be deemed "Qualified" if he or she meets all of the following criteria:

       i.   Prospects must complete NM's tour and sales presentation lasting at least 90 minutes.

       ii.   Prospects must be between the ages of 25-70

       iii.   Prospects must be able to understand verbal communications from our staff and the purchase. All must speak and understand English fluently.

       iv.   U.S Residents only will be accepted.

       v.   Prospects must be legally able to execute a contract and have an annual household income of at least $50,000. Only married or cohabitating, and both parties must attend the presentation.

       vi.   Prospects must demonstrate either steady employment or a steady source of income.

       vii.   All prospects must present photo identification issued by a governmental agency that have the same physical address and possess a valid Major Credit Card in the same name that appears on such identification. No debit cards will be accepted.

       viii.   Maximum of one Tour per household and/or vehicle.

       ix.   Prospects must not have visited the Project within the previous twelve (12) months..

       x.   Prospects must not be owners of Westgate Miami Beach timeshare property or interest. Prospects must not be staying in a camper or RV.

       xi.   Prospects must not have participated in any other timeshare/resort promotion in the past thirty (30) days through Marketer or any of its affiliates, subsidiary, agent, family business, partner or otherwise.

   b.   No fee will be paid to Marketer by NM for non-Qualified Prospects. The determination of whether a prospect is Qualified or non-Qualified will be mutually agreed upon by both Parties using the criteria contained in this paragraph. A list of contact persons at Marketer will be provided to NM to facilitate these discussions.

   c.   NM reserves the right to change qualifications with seven (7) days notice provided to Marketer.

   d.   Marketer will not interfere with any prospects that purchase from NM. Marketer further agrees not to re-book for tours with other clients of CVC any person who purchased from NM.

3

6. <u>COMPLIANCE WITH STATUTORY REQUIREMENTS</u>

    a.    Marketer agrees to comply with, and to train its employees to comply with, all applicable state and federal laws and regulations in all jurisdictions that are applicable to the conduct of Marketer.

    b.    Marketer shall not make any material omission or misrepresentation in its lead generation activities, and shall ensure that its employees, agents, assignees, or representatives are knowledgeable of the timeshare programs offered by NM.

    c.    Marketer shall promptly forward to NM copies of any complaints, letters, demands or other form(s) of communication received from any consumer solicited by Marketer or from any governmental agency in regard to the activities performed under this Agreement. Marketer shall cooperate with NM in the preparation of a response to any complaints. Marketer shall be liable for any representations that are not authorized by NM in writing, resulting in a complaint. Marketer shall be solely responsible for payment of any penalties imposed by a regulatory agency as a direct result of any action of  Marketer.

    d.    Marketer shall perform its duties hereunder in compliance with all U.S., federal, state or local government laws, rules or regulations, specifically to include but not be limited to: the U.S. Telemarketing Consumer Fraud and Abuse Prevention Act and Telemarketi g Sales Rule (15 U.S.C. § 6101, 16 C.F.R. Part 310), the Telephone Consumer Protection Act (47 U.S.C. § 227, 47 C.F.R. Part 64), the federal Fair Housing Act (Title VIII of the Civil Rights Act of 1968), the Equal Credit Opportunity Act (15 U.S.C. § 1691 - 1691d and Reg. B, §§ 202.1 - 202.14), and other applicable anti-discrimination and consumer protection laws.

    e.    In addition, Marketer by its signature below acknowledges having received a copy of NM's "Do Not Call" Policy, and agrees to comply with its terms in carrying out its duties under this Agreement.

    d.    Further, Marketer shall not engage in the following prohibited activities:

        i. Failure to disclose in a clear and conspicuous manner, in its initial contact with the Qualified Prospect, all material terms and conditions associated with the Premium, including but not limited to, any costs to be paid by the Qualified Prospect relating to the Premium and the requirement that a Qualified Prospect attend a timeshare sales presentation lasting at least 90 minutes;

        ii. Misrepresenting, expressly or by implication, any policy or practice relating to whether persons can cancel, rescind, exchange or receive refunds or credits of monies paid;

        iii. Representing, implying or stating to any person that the person has won any product or service, or will receive any product or service free of charge, or words of similar meaning or intent, when such representation, implication, or statement is not true.

7. <u>REPRESENTATIONS, COVENANTS, AND WARRANTIES OF MARKETER</u>

    a.    Marketer has the legal right, power and authority to enter into this Agreement, and the persons executing this Agreement on Marketer's behalf have the requisite authority to sign the Agreement on behalf of Marketer.

    b.    Marketer will only utilize the NM and Newport Beachside Vacation Club names, trademarks, graphics, and logos for the limited purposes required to perform Marketing  Services under this Agreement and only after it has obtained prior written approval of NM. All such names, trademarks, graphics and logos are presently and shall continue to be owned by NM and its affiliates and in the event this Agreement is terminated, Marketer must immediately thereafter refrain from using any of the foregoing as well as any NM marketing or sales literature. Marketer is not authorized to execute or enter into any contracts in the name or on behalf of NM.

4

c.   Marketer agrees that all telephone marketing scripts, written materials, and Premiums (collectively "Promotional Materials") to be used by Marketer in its lead generation activities will be submitted to and approved by NM prior to their use.

d.   Marketer shall not modify or deviate from the Promotional Materials approved by NM. Marketer shall clearly and promptly disclose the following information, terms, and conditions, in an easily understandable manner, to each and every contacted consumer:

i. The identity of the Marketer, including the name of the Marketer's salesperson and Marketer's toll-free telephone number;

ii. That the purpose of the contact is to offer the Premiums in consideration for the Qualified Prospect's agreement to attend a timeshare sales presentation of at least 90 minutes;

iii. That upon completing the sales presentation on vacation ownership the Qualified Prospect will receive the Premium(s) at no cost. Marketer may not represent that the Premium has been "won";

iv. That no timeshare purchase is necessary in order to receive the Premium(s);

v. All material terms and conditions associated with use of the Premium(s);

vi. That the consumer will receive a confirmation letter from that recaps the terms of the offer;

e.   Marketer will strive to maintain a positive public image for NM and to perform its obligations hereunder in a manner consistent with the integrity and excellence of the reputations of NM by acting at all times in an honest, professional manner and by following good business practices in the performance of Marketing Services for NM as described hereunder.

f.   Marketer agrees that during the term of this Agreement, it will not knowingly engage in any conduct that is or may be detrimental to NM's business interests.

g.   Marketer shall maintain general comprehensive liability insurance sufficient to meet its obligation to indemnify NM pursuant to this Agreement.

8.   REPRESENTATIONS, COVENANTS, AND WARRANTIES OF NM

a.   NM represents that it is qualified to do business in the states where it conducts its business.

b.   NM has the legal right, power and authority to enter into this Agreement, and the persons executing this Agreement on NM's behalf have the requisite authority to sign the Agreement on behalf of NM.

9.   TERMINATION OF AGREEMENT

a.   Either Party may terminate this Agreement by written notice delivered to the other Party as provided in the "Notices" section of this Agreement. The effective date of termination of this Agreement shall be seven (7) days after receipt of such written notice by such Party. All fees earned by Marketer prior to the effective date of the termination of this Agreement will be paid by NM in accordance with this Agreement.

b.   It is understood and agreed by the Parties that all bookings made prior to the effective date of termination of this Agreement will be honored in full by both Parties. Marketer agrees that no bookings will be made hereunder after its receipt of written notice from NM terminating this Agreement.

5

10.    RELATIONSHIP OF THE PARTIES

Marketer is an independent contractor and neither Marketer nor its employees shall be deemed to be employees of NM. This Agreement does not create any partnership, joint venture or other joint undertaking between the Parties, and no party shall be liable for the debts, obligations or liabilities of the other Party, or have the authority to make any representations on behalf of the other Party, except as provided for in this Agreement. Nothing in this Agreement precludes Marketer or NM from contracting with other independent contractors to perform or receive similar services as set forth herein. NM and Marketer agree not to solicit or engage the services of vendors or other tour generators that the other Party has an existing contract with unless agreed to in writing by both Parties prior to any engagement of services.

11.    INDEMNIFICATION

To the fullest extent permitted by law, Marketer agrees to reimburse, indemnify, and hold NM and its agents, employees, officers, directors, representatives and affiliates harmless from and against all claims, damages, losses, fines, penalties, judgments, awards and expenses, including reasonable attorney's fees (collectively "Losses"), arising out of or resulting from Marketer's breach of any representations, warranties or terms of this Agreement including, without limitation, Losses resulting from misrepresentations to Qualified Prospects or potential Qualified Prospects or violations of any applicable law or regulation. Such indemnification shall specifically include, but not be limited to, any liability incurred by NM as a result of any misrepresentation by Marketer, its employees, agents and/or representatives, to tours or members of the general public in connection with this Agreement or any violation of NM's "Do Not Call Policy" or any federal or states' Do Not Call list.

12.    CONFIDENTIALITY

All compensation to Marketer under this Agreement shall be subject to Marketer's compliance with the following provisions during the term of this Agreement and for one (1) full year after the termination hereof:

a.    Marketer shall not disclose or reveal to any person (other than NM's officers, directors and employees and other representatives of NM acting in their capacity as such) any trade secret or other confidential information relating to NM, its subsidiaries or affiliates, or to any business operated by them, including without limitation, any customer lists, leads or database names provided to Marketer or obtained pursuant to Marketing Services performed by Marketer hereunder, and Marketer confirms that such information, lists, names or otherwise are and shall remain the exclusive property of NM.

b.    Marketer agrees that all information received from NM or from any other source on NM's behalf is "Confidential Information" and shall be maintained in confidence and not disclosed, used or duplicated, except as described in this Agreement. Confidential Information includes, without limitation, all lists of customers, former customers, applicants and prospective customers and all information relating to and identified with such persons including, but not limited to, financial information.

c.    Marketer may use Confidential Information solely in connection with performance under this Agreement and will maintain the strict confidentiality of all such Confidential Information. Marketer shall use the information solely for the purposes for which the information is disclosed to Marketer by NM. Marketer shall not copy Confidential Information or disclose Confidential Information to any third person, including employees of Marketer who do not need such Confidential Information in order to perform required Marketing Services pursuant to this Agreement.

d.    If Marketer proposes to disclose Confidential Information to a third party in order to perform required Marketing Services pursuant to this Agreement, Marketer must first obtain the written consent of NM to make such disclosure and Marketer must enter into a confidentiality agreement

6

with such third party pursuant to which such third party would be restricted from disclosing, using or duplicating such Confidential Information, except as consistent with this paragraph 12.

e.  All marketing material, including, without limitation, artwork, designs, concepts, scripts and photographs, shall survive the termination of this Agreement and remain the exclusive property of the Party producing or commissioning the materials. No Party may use the other Party's marketing material without the prior written consent of that Party. In the event that NM provides Marketer with a list(s) of potential Clients (in whatever format) to be contacted by Marketer on behalf of NM pursuant to this Agreement, such list(s) and the information contained therein shall be considered confidential and proprietary to NM and shall be immediately returned to NM upon request or termination of this Agreement, along with all marketing materials provided by NM. Marketer agrees to use such information solely for NM's benefit and not for the benefit of Marketer or of any third party.

f.  Failure of Marketer to use and protect any Confidential Information in the manner set forth in this paragraph 12 shall give rise to irreparable harm and damages to NM may enjoin any such action and seek and receive damages from Marketer as a result thereof.

13.  **ASSIGNMENT/AMENDMENTS**

a.  The rights and obligations of Marketer under this Agreement may not be assigned to any party without the prior written consent of NM.

b.  No modifications or amendments to this Agreement shall be binding upon the Parties hereto unless stated in writing and executed by the Parties intended to be bound thereby.

14.  **ARBITRATION**

It is the intent of the Parties that any unresolved dispute relating to or arising out of this Agreement shall be settled first by negotiation. In the event the Parties do not negotiate a settlement, the Parties agree to make a diligent and good faith effort to arbitrate their dispute before a mutually acceptable arbitrator, which arbitration shall be a condition precedent to the filing of a lawsuit or initiating other legal action. If the Parties cannot agree on an arbitrator, either party may petition the American Arbitration Association to appoint an arbitrator. The cost of arbitration shall be shared by the Parties. Notice of demand for arbitration must be filed in writing with the other Party and must be made within a reasonable time after the dispute has arisen.

15.  **ATTORNEY'S FEES, GOVERNING LAW, AND VENUE**

If legal action (other than arbitration) is commenced to enforced or to declare the effect of any provision of this Agreement, the prevailing Party (as determined by the court or arbitration) shall be entitled to an award of reasonable attorney's fees and costs incurred at trial, on appeal, on petition for review, or in any related bankruptcy matter. A Party shall also be entitled to reasonable attorney's fees and costs incurred to enforce or collect a judgment or award. This Agreement shall be governed and construed in accordance with the laws of the State of Florida.

16.  **PARTIES BOUND; SURVIVAL**

This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their successors. This Agreement contains provisions which are intended by the Parties to survive its expiration or termination.

17.  **ENTIRE AGREEMENT**

This Agreement contains the entire agreement between the Parties. Any and all verbal or written

7

agreements made prior to the date of this Agreement are superseded by this Agreement and shall have no further effect. No modification or change to the terms of this Agreement will be binding on a Party unless made in writing and signed by an authorized representative of that Party.

18. **SEVERABILITY**

If any section, paragraph or provision of this Agreement shall be declared iNMalid or unenforceable, the remaining portions of this Agreement shall continue in full force and effect.

19. **WAIVER**

A waiver of either Party at any time or times to demand strict performance by the other of any of the terms, covenants, or conditions as set forth herein shall not be construed as a continuing waiver nor relinquishment thereof and each Party may at any time demand strict and complete performance by the other of said terms, covenants, and conditions.

20. **COUNTER PARTS**

This Agreement may be executed in duplicate original counterparts, one of which shall be retained by NM and the other by Marketer. Facsimile signatures shall be deemed to be original signatures for purposes of executing this Agreement and amendments hereto and for purposes of issuing all instructions authorized or permitted hereunder.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day last written below by their duly authorized officers.

**MARKETER:** ~~~~~~~~~~~~~              Dated this ~~~~ day of ~~~~~~~~, 2012

By: ~~~~~~~~~~~~~~~~~~~~~~

Name: ~~~~~~~~~~~~~~~~~~~

Title: ~~~~~~~~~~~~~~~~~~~

**NM:**                                   Dated this _10_ day of _Sept._ , 2012
Newport Marketing, LLC
16701 Collins Avenue
Sunny Isles Beach, FL 33160

By: _____

Name: _____

Title: ___ SR. MARKETING MANAGER

8

## EXHIBIT A

## Newport Marketing LLC
## DO NOT CALL POLICY

Revised Date: January 18th, 2012

1.  **PURPOSE**

It is the intention of Newport Marketing LLC and its subsidiaries, including but not limited to, Newport Marketing, LLC (collectively, "Newport") to establish, implement, and maintain systems and procedures to comply with the Telephone Consumer Protection Act (47 U.S.C. § 227, 47 CFR, Part 64) and the Telemarketing Consumer Fraud and Abuse Prevention Act and Federal Telemarketing Sales Rule (15 U.S.C. § 6101, 16, CFR Part 310), as well as various state laws, which are designed to protect the privacy of persons who do not wish to receive unsolicited telephone sales calls at their residence. The purpose of this DO NOT CALL POLICY ("Policy") is to effect Newport's compliance with such laws.

2.  **SCOPE**

This Policy applies to all employees and third party telemarketing agencies ("outside telemarketers") of Newport involved with Newport's telemarketing operations.

3.  **POLICY**

A copy of this Policy shall be provided within ten (10) business days on demand to all persons who do not wish to receive unsolicited calls at their residence by or on behalf of Newport and request a copy of this Policy. The guidelines below outline the terms of this Policy and how it shall be implemented.

A.  Each Newport telephone salesperson/telemarketer, shall be given a copy of this Policy, must acknowledge receipt of same, and will receive verbal instruction from a supervisor regarding enforcement of the policy.

B.  Whenever Newport employs staff for the purpose of placing outbound telemarketing calls to consumers at their residences or engages an outside telemarketer to make such calls, the in-house supervisor shall provide copies of this Policy to each telemarketing salesperson, and shall implement this Policy. Newport has designated its Chief Operating Officer as the compliance officer.

9

C. If any consumer states during any unsolicited sales call "Please don't call me again," "Put me on your do not call list," or other similar words to that effect, upon termination of the call, the telemarketing salesperson or verifier must enter the consumer's name, telephone number, and date of request on the daily Do Not Call List and into the dialer database. At the end of each day, each salesperson or verifier must provide the daily Do Not Call List to his or her supervisor to be forwarded to the appropriate Newport office and entered into the Newport master Do Not Call List at the end of each month. Newport will compile a master Do Not Call List comprised of each outside telemarketers' Do Not Call List and Newport's in-house Do Not Call List (which includes the Federal, Direct Marketing Association and applicable state Do Not Call Lists along with all Do Not Call Requests received from consumers). Any phone numbers appearing on the daily or Master Do Not Call List or entered into the dialer or contact management system, i.e. Prolead, must not be called again. These phone numbers will be stored in Newport's Master Do Not Call List database and coded as unusable for a period of five (5) years, or until such time as the telephone number is reassigned to a new consumer. Any consumer requesting that his or her name and/or number be removed from the calling list must immediately be coded as "Do Not Call" or if a paper lead slip is being used the words "Do Not Call" along with the date and time must be written on the lead slip. The list shall be sent electronically to DNCDept@NewportMarketingLLC.com for inclusion in Newport's Master Do Not Call List.

D. All lists of sales prospects provided by Newport to its telemarketers or its outside telemarketers shall be scrubbed against Newport's Master DNC List prior to distribution: Phone numbers appearing on the Master DNC List must be removed from the list of sales prospects before a lead list is given to any telemarketing salespersons or outside telemarketers. This guideline must be followed regardless of how such leads were matched to the number expressly consented to be called by Newport or the outside telemarketer. In all other events, the numbers of sales prospects must be screened to eliminate any Do Not Call numbers before the calls are made. Newport's outside telemarketers shall only contact sales prospects from Newport Lead Lists and Marketer Lead Lists. Outside telemarketers shall immediately remove each Lead List and/or Marketer Lead List from their dialer software programs, or any other databases or telemarketing lists, after the expiration of such thirty (30) day period. Outside telemarketers shall have the right to re-submit a previously scrubbed and coded Marketer Lead List for an additional thirty (30) day period, provided each such Marketer Lead List has been re-submitted to, and scrubbed and coded again by Newport.

E. Newport and each outside telemarketer shall update its Do Not Call List not less frequently than monthly, and each outside telemarketer shall provide Newport with a copy of its updated Do Not Call List not less frequently than monthly.

F. Newport and its outside telemarketers shall obtain or subscribe to and incorporate into their Do Not Call Lists each applicable government managed Do Not Call List where Newport is

10

conducting its marketing. Newport and its outside telemarketers shall obtain updates to these government managed lists in accordance with applicable law. Newport and its outside telemarketers may also incorporate into their master Do Not Call Lists similar do not call lists maintained by certain private organizations such as the Direct Marketing Association.

G. In the event that Newport or its outside telemarketers are not using automated dialing equipment or contact management systems, they must use either Newport Lead Lists or Marketer Lead Lists that have been pre-approved, coded and scrubbed against Newport's Master Do Not Call.

H. If a consumer who receives an unsolicited sales call says something to the effect that "I told your company before I didn't want to be called again," "I told your company to put me on its do not call list," or similar words to that effect, the caller must politely apologize and verify the telephone number for placement on the Do Not Call List. The caller shall ask the consumer if there are any other telephone numbers at that residence, make a note of such numbers, and terminate the call. If such telephone number is not already included in the Do Not Call List, the salesperson must bring this to the attention of his or her supervisor to ensure that the name is properly added. If the phone number was on the Do Not Call List but the prescreening failed to remove the telephone number from the list of sales prospects, the supervisor should be informed of this fact so that the screening process can be reviewed and improved. In addition, a separate list of such telephone numbers that are called again after they were placed on the Do Not Call List shall be maintained or specifically identified on the master Do Not Call List so that additional steps may be taken to prevent such telephone numbers from being called again.

4.      Each telemarketer/salesperson of Newport and its outside telemarketers shall be required to comply with this Policy and the following rules:

A.      Immediately upon placing a telemarketing call, the person placing the call must: (i) identify himself or herself by name; (ii) state on whose behalf the call is being made (i.e., Newport); (iii) state the purpose of the call; and (iv) leave an address or telephone number for further contacts;

B.      No telephone call may be placed to a residence before 8:00 a.m. or after 9:00 p.m. local calling time; and,

C.      Telemarketers must be courteous at all times. They should not raise their voice, use inappropriate language including but not limited to profanity, e. .d/or interrupt or hang out without politely concluding the conversation.

11

D.   Each outside telemarketer shall ensure that its customer service telephone number and its name, or Newport's name, is displayed on consumer's called identification devices.

_____
**Marketer**

_____   Date: ___9/12/12___
**Newport Marketing, LLC**

# Exhibit B

### NEWPORT MARKETING LLC TELEMARKETING COMPLIANCE

1. **DROP RATE:**
   I understand and agree that if my company utilizes a predictive dialer, that I will maintain our "drop rate" below 2% by campaign, by month per FTC and FCC regulations.
   Initial ▓▓▓▓

2. **SUPPRESSION:**
   I understand and agree that my company will follow all Federal telemarketing and suppression laws. These laws include scrubbing against the Federal DNC List at least every 31 days, scrubbing against the wireless ported list at least every 15 day. I also agree that if I do not have the capacity or knowledge to ensure this is happening then I will ask Newport for guidance.
   Initial ▓▓▓▓

3. **SAFE HARBOR:** I understand that Federal safe harbor laws are very stringent and require the following items be met without fail:
   a. Have in place written procedures to comply with national DNC rules including (but not limited to) how to handle a DNC request from a consumer.
   b. Conduct employee training regarding DNC procedures and have on file signed documentation of this training.
   c. Maintain an in-house suppression file, and keep it current with Newport's internal DNC listing.
   d. Purchase and use the Federal DNC list.
   e. Purchase and use State DNC lists where marketing (where applicable)
   Initial ▓▓▓▓

4. **WIRELESS NUMBERS:** I understand that dialing to any wireless telephone number is prohibited via an automatic or predictive dialer. Furthermore, I also understand that some states prohibit marketing to these numbers even by hand dialing. I will suppress against the Wireless Block list where appropriate.
   Initial ▓▓▓▓

5. **EBR:** I understand and agree that my company will not attempt to use EBR leads without written permission from Newport.
   Initial ▓▓▓▓

6. **VOICE BROADCAST:** I understand and agree that my company will not engage in voice message broadcasting at any time without written approval from Newport Resorts.
   Initial ▓▓▓▓

7. **SUPPRESSION PACKAGE:** I understand that I will assigned or may be required to acquire and maintain either a DNCSolution account or a DNC.Com account to be able to market on behalf of Newport. I will use this account to scrub all leads used for marketing under the Newport name. Any deviation from this will need explicit written permission from Newport.
   Initial ▓▓▓▓

8. **CALLER ID:** I agree that I will not block or send false called ID information on any marketing calls. will ensure that our equipment is sending accurate information- including the proper business name where possible. I also agree that the telephone number projected during telephone solicitations will allow a consumer to call back for DNC request purposes during normal business hours.
   Initial ▓▓▓▓

Signed: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓            Date: ▓▓▓▓▓▓▓▓

Printed Name: ▓▓▓▓▓▓▓▓▓▓▓▓▓            Title: ▓▓▓▓▓▓▓▓

13

## **Exhibit C**

This MARKETING SERVICES AGREEMENT ("Agreement") is made by and between

~~[redacted]~~, a ("Marketer") and Newport Marketing, LLC. ("NM").

1. NM will pay $275.00 (net premium costs), the following week for every qualified tour procured by broker off premises who attends and complete a sales presentation.

2. Valet parking services will be paid by Marketer. Cost of $5.

3. All premium costs are the responsibility of the Marketer. All premiums may be used from the attached approved list.

4. Upon placing any telemarketing call, the person placing the call must:

   a. Identify himself of herself by name;
   b. State, on whose behalf the call is being made (i.e., Newport Marketing);
   c. State the purpose of the call, and
   d. Leave an address or telephone number for further contacts

5. Marketer m ay not use NM's name, trademark, or logo in any manner and in any media whatsoever, including, but not limited to, written or oral advertising materials and scripts, unless approved in advance, in writing, by NM. Marketer shall not use the name, trademark nor logo of any Premium distributor without the prior written approval of NM and such premium distributor

6. In order to remain at the rates established in this exhibit the brokers minimum VPG for tours should be $1200. In the event broker fails to achieve the minimum VPG, NM shall be entitled to modify Broker's compensation.

7. In the event NM and Broker are unable to agree to a modified compensation arrangement, NM should be entitled to immediately terminate this agreement without further liability.

_____        Date _____
**Marketer**


_____        Date: 9/12/12
**Newport Marketing, LLC**

14

**Company Name :**
Vacation Consultants LLC

**Presentation Location:** Newport Beachside Hotel & Resort
**Address:** 16701 Collins Ave. Sunny Isles Beach, FL 33160

**Gift Offered:**
* 3/2 Orlando Getaway
* 3/2 Daytona Getaway
* 3/2 Las Vegas Getaway
* 3/2 Bahamas Cruise

**Additional Gifting Options:**
* $50 Dining Dough Gift Card
* $100 or $50 Kitchen 305 Dinner Voucher
* $100 or $50 Aveda Spa & Salon Voucher

## Tour Times

| Mon | Tues | Wed | Thurs | Friday | Sat | Sun |
|-----|------|-----|-------|--------|-----|-----|
| 10:00 | X | X | 10:00 | 10:00 | 9:30 | 9:30 |
| 1:00 | 1:00 | 1:00 | 1:00 | 1:00 | 12:30 | 12:30 |
| 3:00 | 3:00 | 3:00 | 3:00 | 3:00 | X | X |
| 5:00 | 5:00 | 5:00 | X | X | X | X |

**\*Important:** Guests must arrive 15 minutes prior to tour times.

_____
**Marketer**                    **Date**

Newport Marketing, LLC allocated __5__ tours , per wave.

Tour times approved by :

_____        9/17/12
Newport Marketing, LLC         **Date**

15

| | |
|---|---|
| **3/2 Orlando Vacation Certificate*** | $20.00 |
| *Request must be made at least (45) days prior to the travel requested date.* | |
| *Taxes and activation fee not included. Travel must be completed within 18 months. | |
| **3 Day/2 Night Daytona Certificate*** | $25.00 |
| *Taxes and activation fee not included. Travel must be completed within 18 months. | |
| **3 Day/2 Night Las Vegas Certificate*** | $25.00 |
| *Taxes and activation fee not included. Travel must be completed within 18 months. | |
| **3 Day/ 2 Night Bahamas Cruise** | $25.00 |
| **$100 Kitchen 305 Voucher** | $60.00 |
| **$50 Kitchen 305 Voucher** | $30.00 |
| **$100 Seven Seas Spa & Salon Voucher** | $60.00 |
| **$50 Seven Seas Spa & Salon Voucher** | $30.00 |
| **$50 Dining Dough Gift Card** | $15.00 |

Initial 

16

# E X H I B I T

# 2

**EXHIBIT 2**

Marketing Agreement

This agreement (the "Agreement") is entered into on _03_ / _13_ / _2012_, Between The Newport Marketing, LLC (NMLLC ) and G̲L̲O̲B̲A̲L̲ ̲P̲O̲S̲T̲I̲O̲N̲I̲N̲G̲ ̲S̲e̲r̲v̲i̲c̲e̲S̲ (Marketer), a L̲I̲M̲I̲T̲E̲D̲ ̲L̲I̲A̲B̲I̲L̲I̲T̲y̲ ̲c̲o̲r̲p̲o̲r̲a̲t̲i̲o̲N̲

**WHEREAS**, Marketer is an entity which provides qualified tours for sales programs; and

**WHEREAS**, the NMLLC desires to retain Marketer to provide NMLLC with qualified tours under the terms and conditions set forth herein;

**NOW THEREFORE**, in consideration of the promises and mutual obligations hereinafter set forth, NMLLC and Marketer hereby agree to the following.

1. **Tour Generation Program**

    1.1. On a daily basis or as requested by NMLLC, Marketer will supply NMLLC with qualified tours meeting the criteria set forth on Exhibit Page which is incorporated by reference.

    1.2. All representation or statements made by Marketer to a potential or generated tour, whether automated, verbal (e.g. telephone solicitation), written (e.g. caller id, etc.) or any other form, will comply with all applicable local, state and federal laws, regulations, ordinances and rulings including, but not limited to telemarketing, "Do Not Call" list solicitation, deceptive practices, consumer protection and other laws. Marketer will obtain all licenses, bonds, permits, registration, or other approvals required of Marketer prior to commencement of the program.

    1.3. Marketer will be responsible for all personnel, equipment and facilities necessary for Marketer to perform its service hereunder.

    1.4. The obligations of the Marketer shall include, but will not be limited to the following:

        a) Identify and market potential prospects at Marketer's expense.

        b) Supply the prospect with information on the Resorts and/or the NMLLC vacation club program.

        c) Make all travel arrangements and room reservations for potential clients.

    1.5. Reservations: Marketer reservation office is located in North Miami Beach Florida, and the contact information is as follows:

    | | |
    |---|---|
    | Attention: | Elisa Thielen - Reservations Manager |
    | Phone: | 305-949-1300 Ext. 7603 |
    | Cell: | 786-629-8827 |
    | Fax: | 305-749-2120 |
    | E-mail: | ethielen@newportvacationclub.com |

    Marketer Contact information:

    | | |
    |---|---|
    | Attention: | JOSE. C. REYES — OWNER |
    | Address: | 235 Commercial Blvd STE 201. Lauderdale by the Sea, FL. 33308 |
    | Phone: | (954) 536-2606 |
    | E-mail: | JREYES@AllWORLDFINANCIAL.com |

1

a)  NMLLC will confirm to Marketer all reservations by e-mail. Before confirmation the Marketer must provide the reservation agent with copy of the signed disclosure statement and a valid credit card for the payment of the rates and fees.

b)  Marketer agrees that all rates granted herein are to be used exclusively for the tour program referred to in this Agreement, which includes a minimum stay of 3 days and 2 nights, and may not be advertised to the general public independent of this promotion. Likewise, such rates may not be used with tour operators, travel agents, timeshare companies or any other traditional hotel room production outlet, and may not be combined with any NMLLC or Occidental Hotels & Resorts promotion.

c)  **No bookings will be allowed at Christmas, New Year, Easter week and Thanksgiving.** All reservations are subject to availability. For additional room nights the following rates apply:

| | |
|---|---|
| May 1st – December 20th | $89 each additional night |
| January 5th – April 30th | $149 each additional night |

d)  Cancellation Policy: All confirmed bookings will be charged one night on the all inclusive plan for all parties involved in such bookings, if cancelled with less than ten (10) days prior to arrival. NMLLC has the right to cancel without notice all bookings not paid by Marketer fifteen (15) days prior to arrival.

1.6.  Marketer hereby represents and warrants that:

a)  Marketer will fully maintain and use applicable "Do Not Call" lists made available (i) by any state into which Marketer may contact a potential customer/lead; (ii) by LMCC and/or (iii) which Marketer has generated or created through any source.

b)  Marketer will fully indemnify and hold NMLLC, its shareholders, officers, directors, employees, agents and representatives, harmless from any loss, fine, penalty, award, damage or liability, including attorney's fees, resulting in any way from the action or inaction of Marketer, its shareholders, officers, directors, employees, agents or representatives, in furtherance of Marketer's tour generation program.

c)  Neither Marketer, nor its shareholders, officers, directors, employees, agents and representatives, will use NMLLC name or make any reference to NMLLC other than for the specific and sole act of booking tours to attend a sales presentation of NMLLC.

d)  Neither Marketer, nor its shareholders, officers, directors, employees, agents and representatives, will use any method of script or material to contact potential tours or to generate tours to attend seminar presentations of NMLLC other that as approved in writing by Company prior to such use.

e)  Marketer, its shareholders, officers, directors, employees, agents or representatives, shall fully comply with all bonding requirements, statues, regulations, pronouncements, notices, rulings and other government mandates in any way related to telephone solicitation/marketing, telephone calls, sweepstakes, promotions, dialers, "No Call Lists", recorded messages, trade notices acts, or the generation of tours for NMLLC.

f)  Marketer will provide NMLLC with the company's active and valid "Seller of Travel".

2.  **Compensation** – NMLLC agrees to pay Marketer (see Exhibit Page) for each qualified tour generated by Marketer, which attends a NMLLC sales presentation as scheduled, less any fulfillment cost.

3.  **Independent Contractor** – Marketer is an independent contractor and not an employee of NMLLC. Marketer and its shareholders, officers, directors, employees, agents and representatives will not have

2

any claim against NMLLC for vacation, sick leave, profit sharing retirement benefits, Social Security, worker's compensation, disability, or unemployment insurance benefits or any other employment benefits of any kind. Marketer will be treated as an independent contractor for all purposes, including without limitation, taxation.

**3.1. Indemnity** – Marketer agrees to comply with applicable law and commit no act, which violates any local, state or federal law in connection with its Tour Generation Program. Marketer agrees to indemnify and hold the NMLLC (and its affiliates, successors and assigns) harmless from any damages, claims or actions sustained as a result of any failure by Marketer to comply with applicable law or any breach of any provision of this Agreement. NMLLC agrees to indemnify and hold Marketer harmless from any damages, claims or actions sustained as a result of a breach by NMLLC of the provisions of this Agreement. This paragraph will survive any termination of this Agreement.

**3.2. Termination** – The Agreement may be terminated or cancelled for any or no reason, by either party, by giving the party written notice of its intention to terminate. The entire pipeline of Mini – Vacs booked through the final day of the agreement will be honored and qualified tours will be paid. Each party reserves the right to terminate this agreement with a thirty (30) day written notice.

**3.3. Notices** – All notices provided for by this Agreement will be deemed given if in writing and mailed to the addresses set forth in Agreement. Notice will be deemed to have been given on the date such notice was deposited with a reputable overnight courier or in the United States mail, certified postage prepaid, return receipt requested to at the addresses for the parties set forth below, or to such other address as may be specified in writing by either party from time to time.

The Marketer
GLOBAL POSITIONING SERVICES LLC.
235 COMMERCIAL BLVD. STE 201
LBTS, FL 33308

Newport Marketing, LLC
16701 Collins Ave
Sunny Isles Beach, FL 33160
Attn: Elisa Thielen

4. **Waiver** – The failure of either party to exercise any power given it hereunder or to insist upon strict compliance with the terms of the Agreement will not constitute a waiver of that party's rights to demand exact compliance with the terms hereof. Waiver by a party of any particular default by the other will not affect or impair their rights with respect to any subsequent defaults of the same or different kind, nor will any delay or omission by a party to exercise any rights arising from any default affect or impair its right as such default or any future default. Further, no course of dealings of the party at variance with the terms hereof will constitute a waiver of that party's right to demand later compliance. No amendments of any terms herein shall be effective unless reduced to a writing specifically so stating and signing by all parties hereto.

5. **Severability** – Should any part of this Agreement be declared invalid such decision will not affect the validity of any remaining portion which remaining portion will remain in force and effect as if this agreement had been executed with the invalid portion eliminated, and it is hereby declared the intention of the parties that they would have executed the remaining portion of this Agreement without including any such part, which may for any reason hereafter be declared invalid.

6. **Force Majeure** – Neither the NMLLC nor Marketer will be deemed to be in default or liable for delays in performance hereunder caused by acts of God, wars, strikes, labor disputes, fires, work stoppages, acts of government or any other cause, whether similar or dissimilar beyond the control of the NMLLC or Marketer.

7. **Entire Agreement** – This Agreement, together with adopted Exhibits as may be entered from time to time, contains the entire agreement of the parties and supersedes any or written representation, inducement or promise not contained herein and may not be modified except in writing and signed by the authorized representatives of both parties. Course of dealings shall not apply.

3

8. **Assignment** – Marketer may not assign this Agreement without NMLLC prior written approval. NMLLC may assign this Agreement. Should an assignment by NMLLC occur, it will communicate Marketer the assignee details shortly after assignment has taken place.

9. **Authorization** – The persons executing this Agreement on behalf of each of the parties hereby warrants that he/she is duly authorized to execute this Agreement on behalf of such party.

10. **Representations** – No representations on behalf of the NMLLC may be made by Marketer or its employees or representatives to a potential tour or generated tour, except as approved in writing by the NMLLC.

11. **Solicitations** – Marketer may only solicit tours in states approved in writing by the NMLLC as set forth in Exhibit Page, Section J.

12. **Survival** – All Marketer's representations and warranties to NMLLC set forth herein shall survive the termination of this Agreement for a period of one year from the termination.

13. **Insurance**

    13.1. Marketer shall maintain adequate workers' compensation insurance on its    employees working on NMLLC project.

    13.2. NMLLC may terminate this Agreement immediately if Marketer fails to obtain the required insurance or allows it to lapse during the term of the Agreement.

14. **Use of Name** – Neither party shall have the right to use the name or likeness of the other party in any advertising or marketing without the express written consent of the other party.

15. **Confidentiality** – Each of the parties to this Agreement represents and warrants that it will maintain all business information and/or trade secrets in a strictly confidential manner and will not disclose the same absent written consent of the other party.  This provision will survive termination of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.


Newport Marketing, LLC

JOSE. C. REYES

**Exhibit Page**

**Resort Location:** Miami Beach Florida and vicinity
**Accommodations Offered:**          2 nights/$200.00  (Parking and Resort Fee not included)

**Tour Qualification Requirements:**

a.  Married or cohabitating couples only.  Must be no younger than 25 years of age with a combined annual income greater than $50,000.  Both married and cohabitating couples must show proof they are residing at the same address (matching on their I.D.)

b.  Residents of Florida within a 50 mile radius of the Resort (locals) will be prohibited from taking a presentation.

c.  Must be employed full time.

d.  A customer that is a family member or otherwise related to Marketer is not considered a qualified prospect.

e.  All must speak and understand either English or Spanish.

f.  If a prospect is married or has a cohabitating partner or significant-other, both partners and spouse must be present at the Presentation to be qualified and together will be considered one Qualified Tour.

g.  For identification purposes, each prospect(s) must possess and present at the presentation, a valid driver's license, state ID or Passport AND at least one of the following active major credit cards: Master card, Visa, American Express.  A check/debit card with Visa or Master Card logo is NOT accepted. The prospect may not have attended a presentation at The Newport Beachside Hotel and Resort within the past 12 months.  Also, prospect has not participated in a "Vacation Ownership Presentation" within the last 90 days.

h.  If an unqualified prospect is allowed to attend a presentation and makes a purchase of Company's product / service presented at the presentation, such prospect will be counted as a Qualified Tour for all purposes hereunder.

i.  Must attend the entire 90 minute presentation.

**Compensation:**

j.  NMLLC will pay $300.00 less any fulfillment costs the following week for every qualified tour procured by broker off premises who attends and complete a sales presentation.

k. If the client(s) does not qualify or does not take the presentation for any reason, (skips the tour or shows up without their spouse, etc.)  The NMLLC retains the right to chargeback Marketer the Amount of $250.00 as a Tour fee.

l.  Cancellation requests must be processed within 72 hours prior to arrival. If proper notice is not given to NMLLC this will be considered a "no show" and the Marketer will be charge one night accommodation. Please refer to section 1.5 C for nightly rates.

Newport Marketing, LLC                                        (Marketer)

5

## NEWPORT MARKETING LLC TELEMARKETING COMPLIANCE

1. **DROP RATE:**
   I understand and agree that if my company utilizes a predictive dialer, that I will maintain our "drop rate" below 3% by campaign, by month per FTC and FCC regulations.
   Initial _____

2. **SUPPRESSION:**
   I understand and agree that my company will follow all Federal telemarketing and suppression laws. These laws include scrubbing against the Federal DNC List at least every 31 days, scrubbing against the wireless ported list at least every 15 day. I also agree that if I do not have the capacity or knowledge to ensure this is happening then I will ask Newport for guidance.
   Initial _____

3. **SAFE HARBOR:** I understand that Federal safe harbor laws are very stringent and require the following items be met without fail:
   a. Have in place written procedures to comply with national DNC rules including (but not limited to) how to handle a DNC request from a consumer.
   b. Conduct employee training regarding DNC procedures and have on file signed documentation of this training.
   c. Maintain an in-house suppression file, and keep it current with Newport's internal DNC listing.
   d. Purchase and use the Federal DNC list.
   e. Purchase and use State DNC lists where marketing (where applicable)
   Initial _____

4. **WIRELESS NUMBERS:** I understand that dialing to any wireless telephone number is prohibited via an automatic or predictive dialer. Furthermore, I also understand that some states prohibit marketing to these numbers even by hand dialing. I will suppress against the Wireless Block list where appropriate.
   Initial _____

5. **EBR:** I understand and agree that my company will not attempt to use EBR leads without written permission from Newport.
   Initial _____

6. **VOICE BROADCAST:** I understand and agree that my company will not engage in voice message broadcasting at any time without written approval from Newport Resorts.
   Initial _____

7. **SUPPRESSION PACKAGE:** I understand that I will be required to acquire and maintain either a Teleblock account or a DNC.Com account to be able to market on behalf of Newport. I will use this account to scrub all leads used for marketing under the Newport name. Any deviation from this will need explicit written permission from Newport Resorts.
   Initial _____

8. **CALLER ID:** I agree that I will not block or send false called ID information on any marketing calls. will ensure that our equipment is sending accurate information- including the proper business name where possible. I also agree that the telephone number projected during telephone solicitations will allow a consumer to call back for DNC request purposes during normal business hours.
   Initial _____

Signed: _____     Date: 08. 13 2012

Printed Name: JOSE C. REYES     Title: MNGR

Modified by Legal 2012     Initials: _____     26

E

X

H

I

B

I

T


3

**EXHIBIT 3**

Marketing Agreement

This agreement (the "Agreement") is entered into on <u>10 / 28</u>/2011 Between The Newport Marketing, LLC (NMLLC) and <u>Mind Business Corp</u> (Marketer), a _____

**WHEREAS**, Marketer is an entity which provides qualified tours for sales programs; and

**WHEREAS**, the NMLLC desires to retain Marketer to provide NMLLC with qualified tours under the terms and conditions set forth herein;

**NOW THEREFORE**, in consideration of the promises and mutual obligations hereinafter set forth, NMLLC and Marketer hereby agree to the following.

1. **Tour Generation Program**

   **1.1.** On a daily basis or as requested by NMLLC, Marketer will supply NMLLC with qualified tours meeting the criteria set forth on Exhibit Page which is incorporated by reference.

   **1.2.** All representation or statements made by Marketer to a potential or generated tour, whether automated, verbal (e.g. telephone solicitation), written (e.g. caller id, etc.) or any other form, will comply with all applicable local, state and federal laws, regulations, ordinances and rulings including, but not limited to telemarketing, "Do Not Call" list solicitation, deceptive practices, consumer protection and other laws. Marketer will obtain all licenses, bonds, permits, registration, or other approvals required of Marketer prior to commencement of the program.

   **1.3.** Marketer will be responsible for all personnel, equipment and facilities necessary for Marketer to perform its service hereunder.

   **1.4.** The obligations of the Marketer shall include, but will not be limited to the following:

   a) Identify and market potential prospects at Marketer's expense.

   b) Supply the prospect with information on the Resorts and/or the NMLLC vacation club program.

   c) Send all reservation requests to NMLLC to check the availability for potential clients.

   **1.5. Reservations:** To place a reservation please call or email the department listed below and allow a 72 hour response time for all reservations.

   | | |
   |---|---|
   | Attention: | Elisa Thielen - Reservations Manager |

   | | |
   |---|---|
   | Phone: | 1-888-528-1840 |
   | Cell: | 786-629-8827 |
   | Fax: | 305-749-2120 |
   | E-mail: | reservations@newportmarketingllc.com |

   Marketer Contact information:

   | | |
   |---|---|
   | Attention: | Andrea Pratt |
   | Address: | 5077 NW 7 ST |
   | | APT 1014 |
   | Phone: | (305) 748-6775 |
   | E-mail: | mindbusinesscorp@gmail.com |

   a) Marketer agrees that all rates granted herein are to be used exclusively for the tour program referred to in this Agreement, which includes 3 days 2 nights; and that may not be advertised to the general public independent of this promotion. Likewise, such rates may not be used with tour

1

operators, travel agents, timeshare companies or any other traditional hotel room production outlet, and may not be combined with any NMLLC or Occidental Hotels & Resorts promotion.

**b)** **There will be no bookings December 23rd -January 2nd unless otherwise approved by NMLLC.** Reservations Easter week and Presidents Day weekend need to be submitted 30 days prior to travel. All reservations are subject to availability. For additional room nights the following rates apply and are subject to change:

|  |  |
|---|---|
| May 1st – December 20th | $79 each additional night |
| January 5th – April 30th | $149 each additional night |

**c)** Rooms sleep four (4) people. For every additional person beyond four, there will be an additional room charge as stated above.

**d)** Cancellation Policy: Cancellation requests must be processed within 72 hours prior to arrival. If proper notice is not given to NMLLC this will be considered a "no show" and the Marketer will be charge one night accommodation. Refer to section 1.5 C for nightly rates.

**1.6.** Marketer hereby represents and warrants that:

**a)** Marketer will fully maintain and use applicable "Do Not Call" lists made available (i) by any state into which Marketer may contact a potential customer/lead; (ii) by LMCC and/or (iii) which Marketer has generated or created through any source.

**b)** Marketer will fully indemnify and hold NMLLC, its shareholders, officers, directors, employees, agents and representatives, harmless from any loss, fine, penalty, award, damage or liability, including attorney's fees, resulting in any way from the action or inaction of Marketer, its shareholders, officers, directors, employees, agents or representatives, in furtherance of Marketer's tour generation program.

**c)** Neither Marketer, nor its shareholders, officers, directors, employees, agents and representatives, will use NMLLC name or make any reference to NMLLC other than for the specific and sole act of booking tours to attend a sales presentation of NMLLC.

**d)** Neither Marketer, nor its shareholders, officers, directors, employees, agents and representatives, will use any method of script or material to contact potential tours or to generate tours to attend seminar presentations of NMLLC other that as approved in writing by Company prior to such use.

**e)** Marketer, its shareholders, officers, directors, employees, agents or representatives, shall fully comply with all bonding requirements, statues, regulations, pronouncements, notices, rulings and other government mandates in any way related to telephone solicitation/marketing, telephone calls, sweepstakes, promotions, dialers, "Do Not Call Lists", recorded messages, trade notices acts, or the generation of tours for NMLLC.

**f)** Marketer will provide NMLLC with the company's active and valid "Seller of Travel".

**2.** **Compensation** – NMLLC agrees to pay Marketer (see Exhibit Page A ) for each qualified tour generated by Marketer, which attends a NMLLC sales presentation as scheduled.

**3.** **Independent Contractor** – Marketer is an independent contractor and not an employee of NMLLC. Marketer and its shareholders, officers, directors, employees, agents and representatives will not have any claim against NMLLC for vacation, sick leave, profit sharing retirement benefits, Social Security, worker's compensation, disability, or unemployment insurance benefits or any other employment benefits of any kind.  Marketer will be treated as an independent contractor for all purposes, including without limitation, taxation.

**3.1. Indemnity** – Marketer agrees to comply with applicable law and commit no act, which violates any local, state or federal law in connection with its Tour Generation Program. Marketer agrees to indemnify and hold the NMLLC (and its affiliates, successors and assigns) harmless from any damages, claims or actions sustained as a result of any failure by Marketer to comply with applicable law or any breach of any provision of this Agreement. NMLLC agrees to indemnify and hold Marketer harmless from any damages, claims or actions sustained as a result of a breach by NMLLC of the provisions of this Agreement. This paragraph will survive any termination of this Agreement.

**3.2. Termination** – The Agreement may be terminated or cancelled for any or no reason, by either party, by giving the party written notice of its intention to terminate. The entire pipeline of Mini – Vacs booked through the final day of the agreement will be honored and qualified tours will be paid. Each party reserves the right to terminate this agreement with a thirty (30) day written notice.

**3.3. Notices** – All notices provided for by this Agreement will be deemed given if in writing and mailed to the addresses set forth in Agreement. Notice will be deemed to have been given on the date such notice was deposited with a reputable overnight courier or in the United States mail, certified postage prepaid, return receipt requested to at the addresses for the parties set forth below, or to such other address as may be specified in writing by either party from time to time.

**The Marketer**
Mind business Corp
Andrea Pratt
5077 NW 7ST APT#14
Miami Fl 33126

Newport Marketing, LLC
16701 Collins Ave
Sunny Isles Beach, FL 33160
Attn: Elisa Thielen

4. **Waiver** – The failure of either party to exercise any power given it hereunder or to insist upon strict compliance with the terms of the Agreement will not constitute a waiver of that party's rights to demand exact compliance with the terms hereof. Waiver by a party of any particular default by the other will not affect or impair their rights with respect to any subsequent defaults of the same or different kind, nor will any delay or omission by a party to exercise any rights arising from any default affect or impair its right as such default or any future default. Further, no course of dealings of the party at variance with the terms hereof will constitute a waiver of that party's right to demand later compliance. No amendments of any terms herein shall be effective unless reduced to a writing specifically so stating and signing by all parties hereto.

5. **Severability** – Should any part of this Agreement be declared invalid such decision will not affect the validity of any remaining portion which remaining portion will remain in force and effect as if this agreement had been executed with the invalid portion eliminated, and it is hereby declared the intention of the parties that they would have executed the remaining portion of this Agreement without including any such part, which may for any reason hereafter be declared invalid.

6. **Force Majeure** – Neither the NMLLC nor Marketer will be deemed to be in default or liable for delays in performance hereunder caused by acts of God, wars, strikes, labor disputes, fires, work stoppages, acts of government or any other cause, whether similar or dissimilar beyond the control of the NMLLC or Marketer.

7. **Entire Agreement** – This Agreement, together with adopted Exhibits as may be entered from time to time, contains the entire agreement of the parties and supersedes any or written representation, inducement or promise not contained herein and may not be modified except in writing and signed by the authorized representatives of both parties. Course of dealings shall not apply.

8. **Assignment** – Marketer may not assign this Agreement without NMLLC prior written approval. NMLLC may assign this Agreement. Should an assignment by NMLLC occur, it will communicate Marketer the assignee details shortly after assignment has taken place.

9. **Authorization** – The persons executing this Agreement on behalf of each of the parties hereby warrants that he/she is duly authorized to execute this Agreement on behalf of such party.

3

**10. Representations** – No representations on behalf of the NMLLC may be made by Marketer or its employees or representatives to a potential tour or generated tour, except as approved in writing by the NMLLC.

**11. Solicitations** – Marketer may only solicit tours in states approved in writing by the NMLLC as set forth in Exhibit Page, Section J.

**12. Survival** – All Marketer's representations and warranties to NMLLC set forth herein shall survive the termination of this Agreement for a period of one year from the termination.

**13. Insurance**

    **13.1.** Marketer shall maintain adequate workers' compensation insurance on its    employees working on NMLLC project.

    **13.2.** NMLLC may terminate this Agreement immediately if Marketer fails to obtain the required insurance or allows it to lapse during the term of the Agreement.

**14. Use of Name** – Neither party shall have the right to use the name or likeness of the other party in any advertising or marketing without the express written consent of the other party.

**15. Confidentiality** – Each of the parties to this Agreement represents and warrants that it will maintain all business information and/or trade secrets in a strictly confidential manner and will not disclose the same absent written consent of the other party. This provision will survive termination of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

Newport Marketing, LLC

(Marketer)

4

**Exhibit Page (A)**

**Resort Location:** Miami Beach Florida and vicinity

**Accommodations Offered:** Up to 2 Complimentary nights at the Resort (for additional room nights please refer to section 1.5) Guest will be responsible for taxes and Resort Fee for a total of $15 per night for the entire stay.

**Tour Qualification Requirements:**

a.  Married or cohabitating couples only. Must be 25 years of age to 70 years of age with a combined annual income greater than $50,000.  Both married and cohabitating couples must show proof they are residing at the same address (matching on their I.D.)

b.  Residents of the following Florida counties will be prohibited from taking a presentation: Miami Dade, Broward, Lake, Orange, Osceola, Seminole, Brevard, Volusia, Pinellas, Polk, or Hillsborough.

c.  At least one participant must be gainfully employed or retired. No full time students.

d.  A customer that is a family member or otherwise related to Marketer is not considered a qualified prospect.

e.  All must speak and understand either English or Spanish.

f.  If a prospect is married or has a cohabitating partner or significant-other, both partners or spouse must be present at the Presentation to be qualified and together will be considered one Qualified Tour.

g.  For identification purposes, each prospect(s) must possess and present at the presentation, a valid driver's license, state ID or Passport AND at least one of the following active major credit cards: Master card, Visa, American Express, Discover.  A check/debit card with Visa or Master Card logo is NOT accepted. The prospect may not have attended a presentation at The Newport Beachside Hotel and Resort within the past 12 months.  Also, prospect has not participated in a "Vacation Ownership Presentation" within the last 90 days.

h.  If an unqualified prospect is allowed to attend a presentation and makes a purchase of Company's product / service presented at the presentation, such prospect will be counted as a Qualified Tour for all purposes hereunder.

i.  Must attend the entire 90 minute presentation.

**Compensation:**

j.  Sale of Vacation Package: There will be no compensation other than the 2 complimentary rooms nights provided by NMLLC and the funds collected by the Marketer from the initial sale of the vacation package.

k. If the client(s) does not qualify or does not take the presentation for any reason, (skips the tour or shows up without their spouse, etc.)  The NMLLC retains the right to chargeback Marketer the Amount of $250.00 as a Non- Tour fee.

l.  Cancellation requests must be processed within 72 hours prior to arrival. If proper notice is not given to NMLLC this will be considered a "no show" and the Marketer will be charge one night accommodation. Please refer to section 1.5 C for nightly rates.

_____                    _____
Newport Marketing, LLC                                           (Marketer)

5

# E
# X
# H
# I
# B
# I
# T

# 4

**EXHIBIT 4**

## VACATION PACKAGE MARKETING AGREEMENT

*DESTIN*

THIS VACATION PACKAGE MARKETING AGREEMENT (hereinafter "Agreement") is made and entered into this __13th__ day of __MARCH__, 20 __12__ ("Effective Date"), by and between Newport Marketing, LLC, a Florida corporation having a principal address of 16701 Collins Avenue, Sunny Isles Beach, Florida 33160 (hereinafter "NEWPORT"), and __KILLER MANAGEMENT LLC__, a company/corporation, having an address of __235 COMMERCIAL BLVD. STE 201 LBTS, FL. 33308__, (hereinafter "Independent Contractor"), and registered in the state of Florida as Seller of Travel ID # __—__.

## W I T N E S S E T H:

WHEREAS, NEWPORT is a corporation organized under the laws of the State of Florida and is engaged in the business of furnishing travel services and products to the public;

WHEREAS, Independent Contractor is organized under the laws of the above-referenced state and operates as an Independent Contractor providing telemarketing sales services; and

WHEREAS, the parties wish to enter into an agreement whereby Independent Contractor will market and sell NEWPORT's travel products and services to the public as further set forth herein.

NOW THEREFORE, in consideration of the mutual benefits, obligations, terms and conditions herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, it is hereby agreed as follows:

1.   Performance by Independent Contractor:

   (a)    Independent Contractor represents and warrants that it is duly organized and validly existing under the laws of the above-referenced state and it represents and warrants that it has full authority to enter into this Agreement and to transact the business herein contemplated, and is fully willing, capable and experienced to perform as provided for herein.

   (b)    Independent Contractor shall, through independent means, including specifically telemarketing services, solicit the sale of the NEWPORT discount vacation packages at independently owned and operated NEWPORT preferred provider hotels or Newport Resort as set forth on Schedule 1 annexed hereto (collectively, the "Vacation Packages," and each a "Vacation Package"). The Vacation Packages (as hereinafter defined)

may also include premiums or bonuses which may be modified or withdrawn by NEWPORT upon notice to Independent Contractor.

Independent Contractor shall only contact consumer prospects: (i) from lead lists provided by NEWPORT ("NEWPORT Lead List"), or (ii) IF AND ONLY IF AUTHORIZED BY NEWPORT IN ADVANCE AND IN WRITING, from lead lists provided by Independent Contractor that are pre-approved, "scrubbed" and "coded" by NEWPORT's (or its affiliate's) Data Management Department ("Independent Contractor Lead List"). Independent Contractor understands and agrees that each NEWPORT Lead List and Independent Contractor Lead List shall only be used during the thirty (30) day period immediately following: (i) delivery, if a NEWPORT Lead List, or (ii) completion of "scrubbing," "coding" and delivery by NEWPORT with respect to an Independent Contractor Lead List. Independent Contractor agrees to immediately remove each NEWPORT Lead List and/or Independent Contractor Lead List from its dialer software programs, or any other databases or telemarketing lists, after the expiration of such thirty (30) day period. Independent Contractor shall be permitted to license the use of NEWPORT Lead Lists (the number and size of which may be determined by NEWPORT in its discretion) in accordance with the license fee schedule as set forth on Schedule 2.

Independent Contractor shall be fully and solely responsible for the cost and expense of securing all lead lists (the names on said lead lists shall hereinafter be referred to as "Consumer Leads") to be solicited in furtherance of this Agreement. Any lists consisting of names of Consumer Leads who do not purchase a Vacation Package shall become property of NEWPORT and may not be used, transferred or retained by Independent Contractor except as expressly set forth herein. Any lists consisting of names of Consumer Leads who do purchase a Vacation Package shall similarly be the exclusive property of NEWPORT and may not be used, transferred or retained by Independent Contractor except as expressly set forth herein. Independent Contractor shall not obtain any use, ownership or other interest in or to any NEWPORT lead lists, or any information contained therein, except the limited license expressly set forth herein.

(c) Independent Contractor shall be responsible for complying with any and all applicable registration/licensing requirements, including, but not limited to, seller of travel, travel agency and telephone solicitation registration/licensing requirements, applicable to the business operation and activities of Independent Contractor.

(d) Independent Contractor shall be fully responsible for all costs associated with the marketing and sale of the Vacation Packages, including, but not limited to, lead costs, sales personnel, postage, printing, telephone costs and all other fees, costs and expenses relating to its marketing and sales services.

(e) Independent Contractor represents and warrants to NEWPORT that its marketing and sale of the Vacation Packages and its performance hereunder shall be in compliance with all applicable laws and regulations, including Federal and Florida "Do Not Call" laws, and Independent Contractor shall not make any material omission or misrepresentation in the marketing and sale of the Vacation Packages. Independent Contractor shall strictly comply with the annexed Do Not Call Policy (see Exhibit A).

(f) Independent Contractor shall promptly forward to NEWPORT any complaints, letters, demands or other form of communication received from any consumer solicited by Independent Contractor. Independent Contractor shall also promptly forward to NEWPORT any complaints, letters, demands or other form of communication received from any governmental agency in regard to the activities contemplated hereunder. Independent Contractor shall be responsible for answering and satisfying consumer complaints in connection with the marketing and sale of the Vacation Packages. Independent Contractor shall be liable for any representations that are not specifically, in writing, authorized by NEWPORT.

(g) Independent Contractor shall perform its business activities in compliance with all federal, state or local government laws, rules or regulations concerning the marketing and sale of the Vacation Packages while performing its duties pursuant to this Agreement and shall not violate such laws, rules or regulations, specifically including but not limited to the following prohibited activities:

(i) Using words such as "luxury," "world-class," "superior," or such similar words when describing Vacation Packages, or otherwise misrepresenting that the Vacation Packages are worth more than the consumer is paying;

(ii) Failing to disclose in a clear and conspicuous manner, before a customer pays, the total costs of the Vacation Package;

(iii) Misrepresenting, expressly or by implication, any policy or practice relating to whether persons can cancel, rescind, exchange or return purchases or receive refunds or credits of monies paid;

(iv) Misrepresenting, expressly or by implication, the Vacation Packages, the price of any Vacation Package offered, or Independent Contractor's property identity;

(v) Misrepresenting, expressly or by implication, that the Vacation Packages cannot be purchased at some later time or may not otherwise be available after the initial contact, or that callbacks by prospective purchaser are not accepted, when in fact, such restrictions or limitations do not exist;

Modified by Legal 2012                                                      Initials: _____          3

(vi)    Misrepresenting, expressly or by implication, the conditions under which the purchaser or prospective purchaser may obtain a reservation for the use of offered accommodations or facilities;

(vii)    Representing, directly or by implication, any affiliation with, or endorsement by, any governmental, charitable, educational, medical, religious, fraternal, or civic organization or body; and

(viii)    Representing, implying, or stating to any person that the person has won any product or service or will receive any product or service free of charge or at no cost, or words of similar meaning or intent, when such representation, implication, or statement is not true.

(h)    Independent Contractor agrees and understands that NEWPORT will provide to Independent Contractor telephone marketing scripts to be used by Independent Contractor in the marketing and sale of the Vacation Packages ("Promotional Material"). Both parties agree that it is the intention of this Agreement that all such suggested Promotional Material shall comply with applicable law. Independent Contractor shall not materially modify or deviate from the same in its contents with Consumer Leads.

(i)    Independent Contractor shall indemnify and hold NEWPORT, its parent, subsidiaries, affiliates, and each of their respective officers, directors, shareholders and employees harmless from all damages, losses, causes of action, costs and expenses, including reasonable attorney's fees, whether the same be incurred as a result of investigation, defense or prosecution of any claim or cause of action, or any other loss resulting as a consequence of or in connection with: (i) the actual or alleged wrongful or negligent conduct of Independent Contractor or its officers, directors, employees, or agents; (ii) the actual or alleged breach by Independent Contractor (or any of its officers, directors, employees, or agents) of the terms of this Agreement; (iii) the actual or alleged breach by Independent Contractor or any of its officers, directors, employees, or agents of any of Independent Contractor's representations, warranties or obligations under this Agreement; (iv) any and all misrepresentations or allegations of deceptive trade practices (whether actual or alleged) against Independent Contractor or any of its officers, directors, employees, or agents in the offering of the Vacation Packages or otherwise; and (v) any and all violations of the law and/or allegations on violations of the law (whether actual or alleged) against Independent Contractor or any of its officers, directors, employees, or agents.

(j)    Independent Contractor warrants and represents that neither it nor any of its officers, directors, shareholders have ever: (I) been convicted of a felony or misdemeanor involving an alleged violation of any federal or state telemarketing or telephone solicitation statute, or seller of travel or travel agency statute, or fraud, theft, embezzlement, fraudulent

Modified by Legal 2012                                    Initials: _____          4

conversion or misappropriation of property (for such purposes, a plea of nolo contendere is a conviction); (2) had entered against it, him or her a final judgment of order in a civil or administrative action, including but not limited to a stipulated judgment or order, if the complaint or petition in the civil or administrative action alleged acts constituting a violation of any federal or   state telemarketing or telephone solicitation stature, fraud, theft, embezzlement, fraudulent conversion or misappropriation of property, the use of untrue or misleading representations in an attempt to sell or dispose of real or personal property, or the use of unfair, unlawful or deceptive business practices; or (3) been subject to any currently effective injunction or restrictive court order relating to business activity as a result of an action brought by a federal, state or local publication or unit thereof, including, but not limited to, an action affecting any vocational license.

     (k)    Independent Contractor agrees and understands that it shall be prohibited from using NEWPORT's name, trademark, trade name, or trade logo in any manner and in any media whatsoever, including, but not limited to, written or oral advertising materials and scripts, unless the same are approved in advance, in writing, by NEWPORT.

     (l)    Independent Contractor agrees and understands that it shall be prohibited from representing itself to be or holding itself out as NEWPORT to the public, including but not limited to, any business, consumer, or federal, state or local governmental agency.

     (m)    Independent Contractor agrees that NEWPORT may enter and maintain a presence in any business premises of Independent Contractor for the purpose of monitoring the propriety of Independent Contractor's marketing and sales practices respecting the Vacation Packages and ensuring Independent Contractor and its agents and employees are in compliance with the terms of this Agreement and all applicable laws. Such presence may include, but is not limited to, (i) NEWPORT's use of unannounced inspectors to inspect Independent Contractor's business practices on an unannounced basis.

2.    Schedule of Compensation.

In the absence of any breach of this Agreement by Independent Contractor, NEWPORT shall pay to Independent Contractor a commission as set forth on Schedule 1 (less the below described reserve) for each Qualified Sale (as hereinafter defined).   In the event a purchaser does not pay for a Vacation Package in full at the time or purchase, Independent Contractor's commission for that Vacation Package shall be prorated and payable in installments based upon the percentage of the Vacation Package purchase price paid with each installment paid by a purchaser during the term hereof. Any commission(s) paid for any Vacation Package that is cancelled or otherwise refunded shall be refunded and may be set off and deducted from amounts owed from NEWPORT to Independent Contractor and/or the reserve.

For purposes of this Agreement, an "Qualified Sale" shall be defined as the sale of a Vacation Package by Independent Contractor to a Qualified Purchaser (as hereinafter defined) which sale is not cancelled or otherwise refunded, and is submitted to and accepted by NEWPORT, and for which NEWPORT receives a credit card approval or other form of payment accepted by NEWPORT. "Qualified Purchasers" shall be defined as Vacation Package purchasers who: (1) have a verifiable household income of at least $50,000.00; (2) are 25 years of age or older; (3) are currently married or cohabitating and can  establish cohabitation through a  government issued 1D reflecting an  identical residential address as cohabitating partner; (4) have a major credit card; (5) have not toured a Newport Resort within the past fifteen (15) months; and (6) are not currently a Newport owner. All Qualified Purchasers who vacation together shall be deemed a single Qualified Purchaser hereunder. Amounts shall only be payable hereunder for Qualified Sales paid for in good funds (net of refunds and cancellations) by Independent Contractor. Such compensation shall be paid to Independent Contractor on Friday for all Qualified Sales as of the previous week ending on Sunday.

(a)   Independent Contractor agrees and understands that it can only solicit sales and receive compensation for such sales solely for premiums and vacation packages previously approved and authorized by NEWPORT. Sales of any travel products and/or services not previously and explicitly authorized by NEWPORT pursuant to terms this agreement shall serve as a cause for termination of such agreement and no compensation for such sale(s) shall be received by Independent Contractor. WHEREFORE, NEWPORT permits and authorizes Independent Contractor to solicit sales of the following Vacation Packages:

(i)    3 days/2 nights stay at one of participating NEWPORT partner properties in Miami Beach, Florida.

(ii)   4 days/3 nights stay at one of participating NEWPORT partner properties in Orlando, Florida.

(iii)  4 days/3 nights stay at one of participating NEWPORT partner properties in Bahamas, Grand Bahamas Island.

(iv)   3 days/2 nights stay at one of participating NEWPORT partner properties in Daytona Beach, Florida.

NEWPORT hereby agrees cover the cost and fulfill all sold packages subject to restrictions above. Accommodations at NEWPORT partner properties are subject to availability.  NEWPORT does not guarantee that specific dates at specific participating hotels will be available. However, in the event Vacation Package, travel

service or premium is not available on the requested date, NEWPORT retains the right to a similar product or service at its sole discretion.

(b)   Independent Contractor shall be responsible for any and all additional costs not advertised in packages/services approved by NEWPORT, such as additional nights of stay, hotel/service upgrades, additional premiums, et al.

(c)   Upon demand Independent Contractor shall provide to NEWPORT all records and details of all sales of vacation packages and/or travel services, including any and all receipts, proof of payments, telephone recordings and verification tapes, et al.

(d)   Independent Contractor shall provide Newport Marketing with its privacy policy, Do-Not-Call Policy and any and all other documents, policies and procedures being used in connection with any NEWPORT Vacation packages being sold by Independent Contractor.

NEWPORT reserves the right to amend this section of the agreement.

No amounts shall be due to Independent Contractor except as expressly set forth herein. In addition, no commissions or other amounts shall be due or payable to Marketer on or for amounts received by NEWPORT from purchasers following expiration or earlier termination of this Agreement.

3.   <u>Restrictions.</u>

(a)   Independent Contractor does not and shall not receive a fee, commission or other valuable consideration directly from any purchaser. Independent Contractor does not and shall not have any of the Vacation Package documents in its possession. Independent Contractor shall not issue transportation tickets, lodging or vacation certificates or any other Vacation Package documents to purchasers without the express written consent of NEWPORT.  Any involvement in such a consumer transaction initiated by Independent Contractor by means of any promotion, telephone call, representation or dealing with a purchaser which is not directly and specifically authorized in writing by NEWPORT in accordance with this Agreement, is deemed to be an unauthorized communication by Independent Contractor, independent from the business in dealings of NEWPORT, and Independent Contractor agrees not to engage in or initiate any unauthorized communication. Specifically, by way of example and not limitation, the foregoing would include (i) contact by Independent Contractor by means of a promotion, contact, or communication, including telephone or direct mail communication, made or initiated by actions of Independent Contractor which has not been, in writing, specifically approved by NEWPORT.

(b)      Independent Contractor shall not, at any time during the term of this Agreement and after termination of same, divulge* or use for Independent Contractor's own purposes, or for the purposes of any third party, any trade secrets, confidential or business information relating to the business affairs of NEWPORT. The parties, by execution hereof, acknowledge that NEWPORT has disclosed to Independent Contractor in confidence certain information relating to the business of NEWPORT. Independent Contractor, by execution hereof, acknowledges and agrees that disclosure of all such information by NEWPORT to Independent Contractor has been in confidence and is of a confidential nature. Independent Contractor acknowledges and agrees that Independent Contractor except in pursuit of Independent Contractor's responsibilities and rights shall not use such information under this Agreement, during the duration of this Agreement and after termination of the same.

(c)      Independent Contractor expressly understands and agrees that the names of and all information related to purchasers of the Vacation Packages are the exclusive property of NEWPORT, and Independent Contractor represents and warrants that neither it nor its officers, directors, shareholders, partners, members and employees shall (i) use, sell or otherwise make available to others or transfer such purchaser names or information related to such purchasers in any manner or for any purpose other than as expressly provided for herein or (ii) solicit or attempt to solicit such purchaser names for the purchase of any goods and services other than expressly provided for herein for the term of this Agreement and thereafter. Independent Contractor acknowledges and agrees that it shall be required to execute an Agreement to Safeguard Customer Information ("ASCI") in the form annexed hereto as EXHIBIT B and that this is a material inducement for NEWPORT to enter into this Agreement.

4.    Responsibilities of NEWPORT

(a)      NEWPORT is duly organized and validly existing under the laws of Florida, and has full authority to enter into this Agreement and to transact the business herein contemplated.

(b)      NEWPORT shall not intentionally or knowingly violate any federal, state or local governmental laws, rules or regulations concerning the furnishing of Vacation Packages to the public while performing its duties pursuant to this Agreement.

(c)      NEWPORT shall provide to Independent Contractor, "Electric Processing System" for processing of credit card charges. NEWPORT shall pay for all costs associated with credit card processing and the fulfillment costs of each Vacation Package sold.

5.    Additional Terms and Conditions.

(a)    Independent Contractor shall transfer to NEWPORT on a daily basis all orders from purchasers of a Vacation Package (hereinafter "Purchaser Orders"). Independent Contractor shall provide via mutually agreeable electronic format to NEWPORT the purchaser's name, address, telephone number, total amount of transaction, salesperson identification and the date and time of the sale. If Independent Contractor receives any money from purchasers, Independent Contractor shall hold such funds in trust for NEWPORT and are to deliver the same to NEWPORT immediately.

(b)    Independent Contractor warrants that all purchasers reflected on the Purchaser Orders shall exclusively be NEWPORT's customers and shall be current, fresh sales that have not been submitted by Independent Contractor (or any person or entity acting by or through Independent Contractor) to any other entity. Independent Contractor further stipulates that all Purchaser Orders will be valid and will have been requested and agreed upon by the purchaser and the cardholder.

(c)    Independent Contractor understands and agrees that NEWPORT has the right to facilitate all customer requests for cancellations and/or refund demands and/or chargebacks of any Purchaser Orders submitted for funding. Independent Contractor understands and agrees that NEWPORT may, at its option, deduct the amount of any such chargebacks or refunds from Independent Contractor's next or future scheduled payday(s) or, in the alternative demand payment in the amount(s) of such chargebacks or refunds from Independent Contractor, which payment(s) shall be due net 10 days of demand. This provision shall survive termination of this Agreement.

(d)    Independent Contractor acknowledges and agrees that NEWPORT has no control over the acts and/or omissions of any credit card agency. Independent Contractor further acknowledges that if for any reason a credit card is frozen or cancelled, all funds due to Independent Contractor still being held by such credit card company or other credit card merchant bank in that account, shall not be due and payable to Independent Contractor until such time as the credit card company or credit card merchant bank releases those funds to NEWPORT. Independent Contractor shall not contact or attempt to contact any customer of NEWPORT for any reason whatsoever except in accordance with the terms of this Agreement.

(e)    NEWPORT shall use reasonable business judgment as to what constitutes a valid chargeback to Independent Contractor. NEWPORT shall provide Independent Contractor with the customer name and reason for such chargeback. NEWPORT may, at its option, deduct any chargebacks from Independent Contractor's funds in process on the next scheduled payday or, in the alternative NEWPORT may invoice Independent Contractor for

such chargebacks, which invoices shall be due net I 0 days. This paragraph shall survive expiration or earlier termination of this Agreement. If there are no such funds in process, Independent Contractor shall automatically assume the financial responsibility for its proportionate amount of customer refund.

(f)     Independently Contractor represents and warrants that it has and will maintain at its sole expense a general liability policy in the amount of Five Hundred Thousand Dollars ($500,000.00) per occurrence covering bodily injury, property damage, personal injury, and professional liability during the term and any renewals of this Agreement. Such policy shall name NEWPORT as an additional insured. A package evidencing this insurance must be maintained at Independent Contractor's approved place of business at all times and provided to NEWPORT upon execution of this Agreement.

6.     Exclusivity.
Independent Contractor shall not sell or market the Vacation Package or any similar product for any other party during the term hereof.

7.     Agreement Not to Compete.
Independent Contractor shall devote its best efforts, skill and diligence to the conduct of the business contemplated hereunder and shall not provide access to any Vacation Package purchasers or information regarding such purchasers to third parties during the term of this Agreement or thereafter.

8.     Agreement Not to Solicit Employees.
During the term of this Agreement and for a period of one (I) year after its expiration or termination neither party shall, either directly or indirectly, on its own behalf or on behalf of others, solicit, divert, or hire away, or attempt to solicit, divert, or hire away, to its own business or any business in competition with the other party, any person retained by the other party during the term hereof as a full-time employee, as a part-time employee, or as an independent contractor.

9.     Independent Contractor Relationship.
It is specifically agreed that the relationship of the parties hereto shall be that of a principal and independent contractor and not that of an employer and employee or principal and agent. The parties agree that NEWPORT shall not have a right on control over and to Independent Contractor. However, NEWPORT and Independent Contractor mutually agree as to the objectives and the scope of services required, all as herein set forth. Independent Contractor shall have full power and authority to select the means, manner, and method of performing the work and accomplishing those objectives without detailed direction or control by NEWPORT. The parties hereto recognize and agree that no joint venture or partnership arrangement or agreement is intended or created hereby. No agent, employee or servant of Independent

Modified by Legal 2012                                    Initials: _____     10

Contractor shall be or shall be deemed to be the employee, agent or servant of NEWPORT nor shall any agent, employee or servant of NEWPORT be or be deemed to be the employee, agent or servant of Independent Contractor.  Independent Contractor shall be solely and entirely responsible for its acts and for the acts of its agents, employees, servants and subcontractors during the performance of this Agreement, unless otherwise excepted under the terms of this Agreement. Independent Contractor shall be solely responsible with respect to the compensation payable to its agents, employees, servants and subcontractors and NEWPORT shall have no responsibility with respond to the same. NEWPORT shall be solely and entirely responsible for its acts and for the acts of its agents, employees, servants and subcontractors during the performance of this Agreement, unless otherwise excepted under the terms of this Agreement. Neither Independent Contractor nor NEWPORT shall act on behalf of or represent itself directly or by implication as having authority to act on behalf of the other party except as specifically set forth in this Agreement. Neither party shall have the authority to create any obligation for or on behalf of or in the name of the other party, except as specifically set forth herein.

10.   Tax and Workers' Compensation Liability.

NEWPORT agrees that it will file or cause to be filed, in a timely manner, all required tax forms reporting the compensation and other consideration hereunder paid to or earned by Independent Contractor.  NEWPORT and Independent Contractor acknowledge and agree that their relationship is that of principal and independent contractor and NEWPORT will not withhold any taxes from any amount paid to  Independent Contractor, nor will NEWPORT pay unemployment compensation or provide workers' compensation insurance to Independent Contractor or Independent Contractor's agents or employees. Independent Contractor agrees to file all required tax forms as to its own agents or employees and social security and federal income taxes and any applicable state income taxes.  Independent Contractor shall be solely responsible for all taxes of every kind and nature with respect to Independent Contractor's business activities and NEWPORT shall have no responsibilities with respect to the same.

11.   Term of Agreement.

The term of this Agreement shall be for a period of 365 days from and after the Effective Date, unless earlier terminated pursuant to this Agreement.  Either party may terminate this Agreement within (30) calendar days upon delivering a written cancellation notice to the other party.

12.   Termination.

NEWPORT shall have the right to immediately terminate this Agreement without notice upon the happening of an "Event of Default" as defined in this paragraph. An Event of Default shall be defined as follows:

(a)     Failure of the Independent Contractor to comply with any term or provision of this Agreement.

(b)     The filing of a voluntary petition in bankruptcy by Independent Contractor or if Independent Contractor shall be adjudicated bankrupt or insolvent, or upon the execution by Independent Contractor of an assignment for the benefit of creditors, or upon the appointment of a receiver for Independent Contractor.

(c)     Independent Contractor's violation of any federal, state, county or city law, ordinance or code.

In the event of termination of this Agreement, Independent Contractor shall immediately surrender all of Independent Contractor's rights granted hereunder and shall thereafter refrain from exercising any of the rights and privileges granted hereunder, including, without limitation, the marketing and selling of the Vacation Packages upon thirty (30) days written notice to Independent Contractor.   All advertising materials, Promotional Materials, signs, contract forms, and all other documents, which NEWPORT has made available to Independent Contractor for the purpose of promoting the marketing and sale of the Vacation Packages shall be returned to NEWPORT immediately.

13.   Default/Remedies.

In the event of breach of this Agreement or default of the obligations hereunder, by either party, then, each party shall be entitled to all rights and remedies as may be available under law or in equity as applicable hereto. Specifically, by way of example and not limitation, any party upon breach hereof, shall be liable to the other party for any and all damages provable as a consequence thereof; however, notwithstanding the foregoing, the parties hereto agree that, to the extent that damages are insufficient remedy in respect to such breach, including but not limited to a breach of the provisions hereof concerning exclusivity, agreements not to compete, agreements not to solicit employees, divulging of confidential or business information, or otherwise engaging in activity which is not able to be remedied by the payable money, then, the parties acknowledge that remedies of specific performance, injunction or other equitable relief may be appropriately sought.

14.   Notices.

Any notice, request, demand or other communication required or permitted hereunder shall be given by certified mail, return receipt requested, or via overnight delivery.  If to Independent Contractor, notice shall be addressed as set forth above.  If notice is sent to NEWPORT, the notice shall be addressed as set forth above with a copy to Robert Festinger. Notice shall be deemed given upon delivery or attempted delivery.

Modified by Legal 2012

Initials: _____

12

15.    Assignment.

This Agreement shall be binding upon the parties and their respective successors and assigns; provided, however, Independent Contractor understands and agrees that (i) NEWPORT shall have the power and right to assign any right or interest in this Agreement without the prior written consent of Independent Contractor and (ii) Independent Contractor shall not have the power or right to assign any right or interest in this Agreement without the prior written consent of NEWPORT.

16.    Applicable Law.

This Agreement shall be governed by and construed according to the laws of the State of Florida. Any action to enforce this Agreement shall be brought in the State of Florida, County of Broward, which shall be deemed the proper venue for all purposes.

17.    Entire Agreement.

This Agreement constitutes the entire agreement between the parties with respect to the subject matter herein contained. Any agreements, promises, negotiations, representations or other terms not set forth or referred to in this Agreement are of no force and effect.

18.    Modification.

This Agreement may not be modified or amended except in writing signed by both parties. The parties agree to fully cooperate in negotiating any changes or modifications to this Agreement as may be necessary to fully comply with any Statute or Code described above as may be applicable to matters herein contemplated.

19..    Interpretation.

Should a provision of this Agreement require judicial interpretation, it is agreed that the judicial body interpreting or construing the same shall not apply the assumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that an instrument is to be construed more strictly against the party which itself or through its agents prepared the same, it being agreed that the agents of all parties have participated or had the opportunity to participate equally in the preparation of this Agreement.

20.    Miscellaneous.

If any part of this Agreement shall be deemed invalid under applicable law, the remaining parts of this Agreement shall be in full force and effect as though any unenforceable part or parts were not written into this Agreement. In construing this Agreement, the singular tense shall be deemed to include the plural and the male or neuter gender shall mean and comprehend all genders, whenever such meaning or interpretation is necessary and appropriate. Headings contained in this Agreement are for reference purposes only, and shall not affect in any way the meaning or interpretation of this Agreement. Subject to Paragraph 15 hereof, this Agreement shall be binding upon the parties hereto, their legal representatives,

successors and assigns, and the parties hereto do hereby covenant and agree that they, their legal representatives, successors and assigns will execute any and all papers and documents that may be required in accordance with this Agreement. In the event either party commences an action against the other to enforce any provision of this Agreement or because of a breach by the other party of any of the terms hereof, the prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs through and including any appeal(s), without regard to whether such action is prosecuted to judgment. Any provision of this Agreement that must survive expiration or termination hereof in order to be consistent with its intended meaning (as reasonably understood by NEWPORT) shall so survive expiration and termination regardless of whether or not that provision expressly so provides. A facsimile signature on this Agreement shall be deemed an original signature and binding on the parties. This Agreement may be executed in multiple counterparts, each of which will constitute an original and all of which will constitute one (1) Agreement.

IN WITNESS WHEREOF, this Agreement is executed as of the day and year first above written.

NEWPORT:
Newport Marketing LLC,
a Florida corporation

By: _____
Name: _____
Title: _____

INDEPENDENT CONTRACTOR:
KILLER MANAGEMENT LLC
a LIMITED LIABILITY
company X corporation

By: _____
Name: JOSE C. REYES
Title: MGR

## EXHIBIT A

## Newport Marketing LLC
## DO NOT CALL POLICY

Revised Date: January 18th, 2012

I.   PURPOSE

It is the intention of Newport Marketing LLC and its subsidiaries, including but not limited to, Newport Marketing, LLC (collectively, "Newport") to establish, implement, and maintain systems and procedures to comply with the Telephone Consumer Protection Act (47 U.S.C. § 227, 47 CFR, Part 64) and the Telemarketing Consumer Fraud and Abuse Prevention Act and Federal Telemarketing Sales Rule (15 U.S.C. § 6101, 16, CFR Part 310), as well as various state laws, which are designed to protect the privacy of persons who do not wish to receive unsolicited telephone sales calls at their residence. The purpose of this DO NOT CALL POLICY ("Policy") is to effect Newport's compliance with such laws.

II.   SCOPE

This Policy applies to all employees and third party telemarketing agencies ("outside telemarketers") of Newport involved with Newport's telemarketing operations.

III.   POLICY

A copy of this Policy shall be provided within ten (10) business days on demand to all persons who do not wish to receive unsolicited calls at their residence by or on behalf of Newport and request a copy of this Policy. The guidelines below outline the terms of this Policy and how it shall be implemented.

    A. Each Newport telephone salesperson/telemarketer, shall be given a copy of this Policy, must acknowledge receipt of same, and will receive verbal instruction from a supervisor regarding enforcement of the policy.

    B. Whenever Newport employs staff for the purpose of placing outbound telemarketing calls to consumers at their residences or engages an outside telemarketer to make such calls, the in-house supervisor shall provide copies of this Policy to each telemarketing salesperson, and shall implement this

Modified by Legal 2012

Initials: _____   15

Policy. Newport has designated its Chief Operating Officer as the compliance officer.

C. If any consumer states during any unsolicited sales call "Please don't call me again," "Put me on your do not call list," or other similar words to that effect, upon termination of the call, the telemarketing salesperson or verifier must enter the consumer's name, telephone number, and date of request on the daily Do Not Call List and into the dialer database. At the end of each day, each salesperson or verifier must provide the daily Do Not Call List to his or her supervisor to be forwarded to the appropriate Newport office and entered into the Newport master Do Not Call List at the end of each month. Newport will compile a master Do Not Call List comprised of each outside telemarketers' Do Not Call List and Newport's in-house Do Not Call List (which includes the Federal, Direct Marketing Association and applicable state Do Not Call Lists along with all Do Not Call Requests received from consumers). Any phone numbers appearing on the daily or Master Do Not Call List or entered into the dialer or contact management system, i.e. Prolead, must not be called again. These phone numbers will be stored in Newport's Master Do Not Call List database and coded as unusable for a period of five (5) years, or until such time as the telephone number is reassigned to a new consumer. Any consumer requesting that his or her name and/or number be removed from the calling list must immediately be coded as "Do Not Call" or if a paper lead slip is being used the words "Do Not Call" along with the date and time must be written on the lead slip. The list shall be sent electronically to DNCDept@NewportMarketingLLC.com for inclusion in Newport's Master Do Not Call List.

D. All lists of sales prospects provided by Newport to its telemarketers or its outside telemarketers shall be scrubbed against Newport's Master DNC List prior to distribution. Phone numbers appearing on the Master DNC List must be removed from the list of sales prospects before a lead list is given to any telemarketing salespersons or outside telemarketers. This guideline must be followed regardless of how such leads were matched to the number expressly consented to be called by Newport or the outside telemarketer. In all other events, the numbers of sales prospects must be screened to eliminate any Do Not Call numbers before the calls are made. Newport's outside telemarketers shall only contact sales prospects from Newport Lead Lists and Marketer Lead Lists. Outside telemarketers shall immediately remove each Lead List and/or Marketer Lead List from their dialer software programs, or any other databases or telemarketing lists, after the expiration of such thirty (30) day period. Outside telemarketers shall have the right to

Modified by Legal 2012                                    Initials: _____        16

re-submit a previously scrubbed and coded Marketer Lead List for an additional thirty (30) day period, provided each such Marketer Lead List has been re-submitted to, and scrubbed and coded again by Newport.

E. Newport and each outside telemarketer shall update its Do Not Call List not less frequently than monthly, and each outside telemarketer shall provide Newport with a copy of its updated Do Not Call List not less frequently than monthly.

F. Newport and its outside telemarketers shall obtain or subscribe to and incorporate into their Do Not Call Lists each applicable government managed Do Not Call List where Newport is conducting its marketing. Newport and its outside telemarketers shall obtain updates to these government managed lists in accordance with applicable law. Newport and its outside telemarketers may also incorporate into their master Do Not Call Lists similar do not call lists maintained by certain private organizations such as the Direct Marketing Association.

G. In the event that Newport or its outside telemarketers are not using automated dialing equipment or contact management systems, they must use either Newport Lead Lists or Marketer Lead Lists that have been pre-approved, coded and scrubbed against Newport's Master Do Not Call.

H. If a consumer who receives an unsolicited sales call says something to the effect that "I told your company before I didn't want to be called again," "I told your company to put me on its do not call list," or similar words to that effect, the caller must politely apologize and verify the telephone number for placement on the Do Not Call List. The caller shall ask the consumer if there are any other telephone numbers at that residence, make a note of such numbers, and terminate the call. If such telephone number is not already included in the Do Not Call List, the salesperson must bring this to the attention of his or her supervisor to ensure that the name is properly added. If the phone number was on the Do Not Call List but the prescreening failed to remove the telephone number from the list of sales prospects, the supervisor should be informed of this fact so that the screening process can be reviewed and improved. In addition, a separate list of such telephone numbers that are called again after they were placed on the Do Not Call List shall be maintained or specifically identified on the master Do Not Call List so that additional steps may be taken to prevent such telephone numbers from being called again.

I.  Each telemarketer/salesperson of Newport and its outside telemarketers shall be required to comply with this Policy and the following rules:

    1)    Immediately upon placing a telemarketing call, the person placing the call must: (i) identify himself or herself by name; (ii) state on whose behalf the call is being made (i.e., Newport); (iii) state the purpose of the call; and (iv) leave an address or telephone number for further contacts;

    2)    No telephone call may be placed to a residence before 8:00 a.m. or after 9:00p.m. local calling time; and,

    3)    Telemarketers must be courteous at all times. They should not raise their voice, use inappropriate language including but not limited to profanity, and/or interrupt or hang out without politely concluding the conversation.

J.  Each outside telemarketer shall ensure that its customer service telephone number and its name, or Newport's name, is displayed on consumer's called identification devices.

Modified by Legal 2012

Initials: _____

18

## EXHIBIT "B"

## AGREEMENT TO SAFEGUARD CUSTOMER INFORMATION

This Agreement to Safeguard Customer Information ("Agreement") is entered into by the undersigned (the "Service Provider") for the benefit of Newport Corporation and its affiliate companies (collectively, "Newport").

**WHEREAS,** the Service Provider has agreed to provide services or products to Newport, or to provide services or products on behalf of or for the benefit of Newport, and as a result thereof the Service Provider may receive, maintain process or be granted access to information relation to Newport's customers.

**WHEREAS,** the Service Provider understands and agrees that all information or data relating to Newport's customers (including, but not limited to, name, e-mail address, residence address, business address, telephone number, account number, postal code, social security number, date of birth, gender, or other demographic characteristic, educational background, occupational information, place of employment, name of employer, credit situation, pattern of use, preferences, profile, personal interests or habits, credit information, Newport account information, and any other identifying information, regardless of its accuracy of completeness); whether in paper, electronic or other form, that is delivered to Service Provider by Newport or which may be obtained by Service Provider as a result of its providing services or products to or for the benefit of Newport is proprietary and confidential information owned by Newport (such information IS referred to herein as "Newport's Confidential Customer Information"); and

**WHEREAS,** the Service Provider and Newport desire to establish representations, warranties and covenants applicable to the Service Provider and pursuant to which the Service Provider will maintain appropriate safeguards to ensure the security, integrity, and confidentiality of Newport's Confidential Customer Information.

**NOW, THEREFORE,** the Service Provider hereby covenants and agrees as follows:

1.    The Service Provider represents, warrants, and agrees that it has received sufficient and adequate consideration to support this Agreement and Service Provider's representations, warranties, and covenants set forth herein.

2.    The Service Provider agrees that Newport may enforce the terms and provisions of this Agreement on behalf of itself and all of its affiliates.

3.    The   Service Provider represents, warrants, and agrees that it   presently maintains, and will continue to maintain, appropriate information security safeguards designed to ensure the security, integrity, and confidentiality of Newport's Confidential

Modified by Legal 2012                                          Initials: _____                    19

Customer Information. Such information security safeguards include policies, procedures, and controls designed to (a) protect the security of Newport's Confidential Customer Information, (b) protect against anticipated threats or hazards to the security or integrity of Newport's Confidential Customer Information, and (c) protect against unauthorized access to or use of Newport's Confidential Customer Information that could result in substantial harm or inconvenience to Newport's customers.   The Service Provider agrees that all paper records and electronic media that contain Newport's Confidential Customer Information will at all times be held in a secure area or environment, will be accessible by only the Service Provider's employees and representatives who need access to such information for the purpose of assisting the Service Provider in fulfilling its service obligations to Newport, and will be disposed of and destroyed in a secure manner at such time that the Service Provider is no longer in need of such information, either for the purpose of fulfilling its service obligations to Newport or to comply with applicable laws, rules and regulations.  Nothing contained herein shall limit that Service Provider's ability to comply with any court order or applicable law or regulation requiring the disclosure of Confidential Customer Information by Service Provider. The Service Provider agrees that Newport's representatives and applicable government regulators may, from time to time, during normal business hours, review the Service Provider's information security safeguards and Newport's Confidential Customer Information held by the Service Provider; provided, however, any such review shall be conducted at such time and in such manner so as not to be disruptive to the Service Provider's ordinary business operations.

4.   The Service Provider hereby agrees to provide Newport immediate written notice, addressed to the attention of Newport's General Counsel, if Service Provider obtains knowledge that any of Newport's Confidential Customer Information has been stolen, lost or damaged or accessed by an unauthorized person or used in an inappropriate manner, which notice shall set forth the details of such event or circumstance and a description of Newport's Confidential Customer Information affected by such event or circumstance.

5.   The  Service Provider hereby agrees that its material breach of any covenant, representation or warranty set forth in this Agreement may, at Newport's option, result in a termination of the Service Provider as the provider of services or products to or for the benefit of Newport, and as a result of any such breach, Newport may terminate any and all written contracts by and between the Service Provider and Newport.  The representations, warranties and obligations contained herein shall survive any termination of this Agreement.

6.   This Agreement shall supplement, but not replace, all other written agreements by and between the Service Provider and Newport, and if and to the extent that any provision of this Agreement shall be in conflict with the provisions of any other written agreement by and between the Service Provider and Newport, the provision of this Agreement shall be controlling.

Modified by Legal 2012                                                                Initials:                        20

7.    Service Provider acknowledges the  Confidential Customer Information disclosed herein constitutes proprietary and trade secrets and that unlawful use or wrongful  disclosure of such information in violation of this Agreement will call irreparable harm or damage to Newport.   Service Provider agrees that Newport and its successors and assigns shall be entitled to seek and obtain, in addition to all other remedies available at law or in equity, the remedy of specific performance and/or injunction in any court of competent jurisdiction, for any violation or threatened violation of any provision of this Agreement, without need to post bond.

8.    In the event a suit or proceeding is brought by Newport to enforce the provisions of this Agreement, or to seek remedy for any breach hereof, Newport shall be entitled to receive its reasonable attorneys' fees and disbursements incurred in connection with each suit or proceeding, including fees and expenses incurred in any appellate proceedings.

9.    This Agreement shall be governed by the laws of the State of Florida, without application of conflicts of law principles. Any dispute shall be brought in the exclusive jurisdiction of that state and federal courts of Palm Beach County, State of Florida.

**IN WITNESS WHEREOF,** the undersigned Service Provider has executed and delivered this Agreement effective as of the date set forth below.

KILLER MANAGEMENT LLC
_____
(Insert name of your company/corporation)

By:   _____
        Signature of Authorized Officer

By:   _____
Name:   JOSE C. REYES
Title:   MNGR

## ADDENDUM

This Addendum ("Addendum") forms a material part of that certain Vacation Package Marketing Agreement (together with this Addendum hereinafter collectively referred to as the "Agreement") by and between Newport Marketing, LLC ("COMPANY") and KIUCK MANAGEMENT LLC. ("Independent Contractor") dated 03.13.2012. The parties agree as follows:

1. Notwithstanding anything to the contrary set forth in the Agreement or otherwise, and in addition to any and all indemnification obligations of Independent Contractor as set forth in the Agreement:

   (i)   Independent Contractor shall indemnify and hold COMPANY, its Parent, subsidiaries, affiliates, and each of their respective officers, directors, shareholders, agents, contractors and employees harmless from all damages, losses, fines, penalties, causes of action, costs and expenses, including reasonable attorney's fees through and including any appeal(s), whether the same be incurred as a result of investigation, defense or prosecution of any claim or cause of action arising out of Independent Contractor's (and/or Independent Contractor's officers', directors', employees', contractors' and agents') actual or alleged: (I) negligence; (2) wrongful conduct; (3) breach of the terms of this Agreement (including, without limitation, breach of any of its representations, warranties or obligations hereunder); (4) misrepresentations; and/or (5) deceptive trade practices.

   (ii)  COMPANY shall indemnify and hold INDEPENDENT CONTRACTOR, its parent, subsidiaries, affiliates, and each of their respective officers, directors, shareholders, agents, contractors and employees harmless from all damages, losses, fines, penalties, causes of action, costs and expenses, including reasonable attorney's fees through and including any appeal(s), whether the same be incurred as a result of investigation, defense or prosecution of any claim or cause of action arising out of COMPANY's (and/or COMPANY's officers', directors', employees', contractors' and agents') actual or alleged: (1) negligence; (2) wrongful conduct; (3) breach of the terms of this Agreement (including, without limitation, breach of any of its representations, warranties, or obligations hereunder); (4) misrepresentations; and/or (5) deceptive trade practices.

2. Notwithstanding anything to the contrary set for herein or otherwise, Independent Contractor stipulates, warrants and agrees that, in no instance, will it, its officers, directors, employees and/or agents contact individuals located within the following states via telephone, email, regular mail, overnight mail, or any other method of means in connection with COMPANY, COMPANY's products or services, or this Agreement:

Modified by Legal 2012

Initials: _____ 22

     a.     Pennsylvania;
     b.     North Dakota;
     c.     South Dakota
     d.     Idaho; and
     e.     Such other and further states as COMPANY may specify, in its discretion, in the future.

3. Independent Contractor agrees to: (I) make training ("Training") (which may be conducted live ["Live Training"] or via power-point or other recorded presentation ["Recorded Training"] as COMPANY determines in its sole discretion) mandatory for all of its officers, directors, employees, contractors and/or agents prior to any such individuals directly or indirectly performing any duties hereunder (whether non-supervisory, supervisory or otherwise); (2) not use or reproduce the Recorded Training for any purpose not expressly authorized hereunder; (3) return all copies of the Recorded Training to COMPANY at the end of the Agreement's term and cease and desist from all further use thereof; and (4) reasonably cooperate with COMPANY with regards to all matters contained in this Agreement. At all times, the Recorded Training shall be deemed to be the sole and exclusive property of COMPANY and Independent Contractor's interest in the Recorded Training shall solely be in the nature of a nonexclusive, temporary, revocable license. Live Training, if any, shall take place at Independent Contractor's principle office.

4. Independent Contractor agrees that it shall: (i) comply with and reasonably facilitate all efforts by COMPANY to verify compliance with the terms of this Agreement and all applicable laws, rules and regulations including, without limitation, through use of announced and/or unannounced visits to Independent Contractor's place(s) of business.

5. If there is a conflict between the terms of this Addendum and the terms set forth in the body of the Agreement, the terms of this Addendum shall be controlling.

Newport Marketing, LLC.

By: _____
Name: Steven Hurowitz
Title: Authorized Agent

KILLER MANAGEMENT LLC
(insert name of company/corporation)

By: _____
Name: JOSE C. REYES
Title: MNGER

Modified by Legal 2012

Initials: _____ 23

## SCHEDULE 1 – COMPENSATION

I. NEWPORT agrees to pay Independent Contractor 70% of total amount of each "qualified sale" as defined by Paragraph 2 of this Marketing Agreement so long as such "sale" has been approved by NEWPORT and has not been cancelled within 30 calendar days after the day the sale has occurred. Independent Contractor shall be compensated for all sales approved during a week on Friday of the following week by 4PM ET. Sale shall be deemed approved when all of the following have occurred in such order:

    (a)    Independent Contractor has obtained all required information for the sale and initiated a sale transaction;

    (b)    Independent Contractor has submitted a record of such sale to NEWPORT;

    (c)    Independent Contractor has submitted all verification recording tapes for a sale. All recordings shall contain the following:

        (i)    Name of the company, name of the verification agent, and date of the recording;

        (ii)    Purchaser of the Vacation Package stating his or her Full Name, Telephone Number, Billing and Shipping Address, Payment Method Details, and Email Address if any;

        (iii)    Verification that Purchaser meets all qualifications as described in Paragraph 2 of this marketing Agreement;

        (iv)    All State and Federal disclosures required by law in connection with the sale of Vacation Package;

        (v)    Any and all terms and conditions of Vacation Package and its purchase and Purchaser's clear consent that he or she fully understands and agrees to such terms and conditions;

        (vi)    Date and amount of sale and Purchaser's authorization and agreement to process payment.

    (d)    Independent Contractor shall submit to NEWPORT a true and complete list of all qualified sales for the day before the end of the following business day.

    Upon receipt of all items in subparagraphs (a) through (c) and its components NEWPORT shall approve or decline the sale within seven (7) days and notify Independent Contractor of its decision via email.

Upon approval of the sale NEWPORT will complete the transaction and capture the funds. Any sale transaction processed and charged to purchaser without prior approval from NEWPORT may result in immediate termination of this Marketing Agreement without notice.

2. All reservations must be made at least 1 week in advance for Orlando/Miami hotels, 2 weeks in advance for Daytona/Bahamas hotels, and minimum 30 days in advance for Mexico properties. Reservations must be made in writing by emailing: Reservations@Vacationsbynewport.com.

3. NEWPORT reserves the right to amend any provision contained herein without prior notice.

**IN WITNESS WHEREOF,** the undersigned Service Provider has executed and delivered this Agreement effective as of the date set forth below.

NEWPORT:
Newport Marketing LLC,
a Florida corporation

INDEPENDENT CONTRACTOR:
KILLER MANAGEMENT LLC
a LIMITED LIABILITY
company / corporation

By: _Steven Hurowitz_

Name: _Steven Hurowitz_

Title: _Authorized Agent_

By: _[signature]_

Name: _JOSE C. REYES_

Title: _MNGR_

Modified by Legal 2012

Initials: _[initials]_   25